**John M. STEPHENSON, Appellant (Defendant below),**

v.

**STATE of Indiana, Appellee (Plaintiff below).**

**No. 87S00–9605–DP–398.**

Supreme Court of Indiana.

Jan. 25, 2001.

Brent Westerfield, Indianapolis, IN, Janet S. Dowling, Albuquerque, NM, Attorneys for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Michael A. Hurst, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

After an eight-month jury trial with a record of proceedings covering 33,000 pages, Defendant John Matthew Stephenson was convicted of three murders and sentenced to death. He now appeals his convictions and sentences, arguing the evidence was insufficient to support the convictions, the trial court committed reversible error in several respects, and the death sentence was not appropriate. We find the testimony of the State's two key witnesses and additional circumstantial evidence sufficient to support the convictions. For the reasons set forth in this opinion, we reject Defendant's claims that the trial court both improperly allowed certain hearsay, opinion, prior misconduct evidence, and photographic evidence and improperly refused evidence of a State's witness's criminal history. We also analyze and reject Defendant's claims that his convictions and sentence should be reversed because of alleged juror misconduct in compiling notes on a home computer, prosecutorial misconduct in several respects, violations of his right to a speedy trial, and three violations of his right to be present at all critical stages of the proceedings. Lastly, we review his challenge to the propriety of the death sentence and find the sentence to be appropriate.

*Background*

In large part because Defendant challenges the sufficiency of the evidence supporting his convictions, we will present the facts in some detail. In the early evening on March 28, 1996, Defendant John Matthew Stephenson and his friend, Dale Funk, drove around Warrick County. The two ended up at the residence of Brian Mossberger, a friend of the Defendant and an acquaintance of Funk. While there, Defendant and Funk shot off rounds of firearms with Defendant shooting his own SKS assault rifle. Defendant and Funk left to go target shooting at a railroad crossing on Red Brush Road located near Mossberger's home. Afterwards, Defendant, who was still accompanied by Funk, drove to the mobile home of Brandy Southard and her fiancé, Troy Napier. According to Funk's testimony, they both got out of the car and walked around the mobile home. Defendant yelled for someone but after no one answered, Funk returned to the car and Defendant proceeded toward the mobile home. A few moments later, Funk observed Defendant walk out the front door carrying a splitting maul.

Defendant and Funk returned to Mossberger's house. Shortly thereafter, a pickup truck briefly pulled into Mossberger's driveway. John "Jay" Tyler was the driver of the truck and his wife, Kathy Tyler, and friend Brandy Southard were the passengers. Mossberger testified that Defendant said, "There goes Jay and I've got to catch him." (R. at 24,669.) Funk testified that Defendant said, "If you're coming, come on." (R. at 23,969.)

The evidence as to what happened next comes solely from Funk's testimony at trial. Funk testified that Defendant began chasing the Tyler truck through Warrick County rural roads. The Tyler truck stopped at the intersection of Eble and Youngblood roads and Defendant also stopped his car. The driver-side door of the truck opened slightly, and Jay leaned out of the truck to look at Defendant. At that point, Defendant grabbed his SKS assault rifle, exited the car, and began firing several shots at the Tyler truck. Defendant got back into the car, drove around a corner, stopped his car and got

out. Defendant walked towards the Tyler truck and returned a few minutes later. Defendant threatened Funk stating, "You breathe a word of this and I'll kill you." (R. at 23,980.)

Defendant and Funk then drove directly back to Mossberger's house. Mossberger testified that Defendant held a knife with "red smears" on the blade, by his (Defendant's) face and said, "Jay, Kathy, and Brandy are no more." (R. at 24,674–75.) Mossberger also testified that Defendant washed his knife in the kitchen sink and that Defendant instructed him to "[d]o something with the SKS; get rid of it; make it gone." (R. at 24,678.) Funk offered similar testimony, stating that he observed Defendant "hand[ ] the gun to [Mossberger]; told him to get rid of it." (R. at 23,982.) The next day, Mossberger buried the SKS assault rifle and ammunition in the woods.

Early Friday morning, March 29, police officers discovered the Tyler truck. Inside the truck, the police officers found victims John "Jay" Tyler, Kathy Tyler, and Brandy Southard dead from gunshot and stab wounds. The police officers also discovered bullet holes in the truck and found spent shell casings scattered across the width of Youngblood Road. Forensic testing revealed that the fatal bullets matched those fired from the SKS assault rifle belonging to Defendant. The spent shell casings matched the ammunition discovered in Southard and Napier's mobile home. Other testing revealed Funk's shoe prints were at the mobile home, directly below a broken window. Although the knife used in the killings was not recovered, Defendant owned a similar knife that could have caused the victims' injuries. On that Friday night, Defendant contacted police about the murders and gave a written statement indicating that Brandy Southard had received a threat from one Jimmy Knight.

On Saturday, March 30, while at home, Defendant voluntarily gave a taped statement to Officers Michael Hildebrand and Gary Gilbert and consented to a police search. In his taped statement, Defendant admitted to having seen and talked to the victims on March 28th at around 9:30 or 10:00 p.m. at a local Circle S store. Defendant also stated that afterwards, he went to Mossberger's house and then went straight home.

On Sunday, March 31, Mossberger retrieved the SKS assault rifle and ammunition, placing the SKS in the house and the ammunition in his garage. Police officers arrived at Mossberger's house to question him, and he explained the events that occurred on the day of the killings. Mossberger also showed the officers the SKS assault rifle, but not the ammunition. The same day, Mossberger directed the officers to Funk's apartment in Hatfield. Police officers questioned both Mossberger and Funk and took Funk into custody for further questioning at the Warrick County Security Center. Funk was released on or about April 1. On April 3, 1996, Defendant surrendered himself to the Owensboro Police Department.

The State charged Defendant with Burglary,[1] Theft,[2] and three counts of Murder[3] of each of Jay Tyler, Kathy Tyler, and Brandy Southard. The State also sought the death penalty, alleging as aggravating circumstances that Defendant intentionally discharged a firearm from a vehicle,[4] committed at least one of the murders by lying in wait,[5] and committed multiple murders.[6]

1. Ind.Code § 35–43–2–1 (1993).

2. *Id.* § 35–43–4–2(a).

3. *Id.* § 35–42–1–1(1).

4. *Id.* § 35–50–2–9(b)(14)(B) (Supp.1995). In 1996, the Indiana legislature re-designated subsection (b)(14) to subsection (b)(15) for crimes committed after June 30, 1996. *See* P.L. 228–1996 § 1.

5. *Id.* § 35–50–2–9(b)(3).

6. *Id.* § 35–50–2–9(b)(8).

The trial commenced on September 23, 1996. On May 8, 1997, after deliberating for approximately three hours, the jury found Defendant guilty of Burglary, Theft, and all three counts of Murder. On May 19, 1997, the trial court conducted the penalty phase and the jury recommended that the death penalty be imposed based upon the multiple murder aggravator.[7] The trial court held a sentencing hearing on June 16, 1997. The trial court followed the jury's recommendation and sentenced Defendant to death.

We will recite additional facts as necessary.

### Discussion

### I

Defendant contends that the trial court committed reversible error when it allowed State witness Alan Utzman to testify concerning the contents of Dale Funk's out-of-court statements. The State responds that Utzman's testimony was not hearsay because it met the requirements of Indiana Evidence Rule 801(d)(1)(B).[8]

In a July 16, 1996, deposition, defense counsel asked Funk if, while traveling from Evansville on March 29 (the day after the murders), he spoke to his friend Utzman regarding the events surrounding the triple murder. Funk denied ever having had such a conversation with Utzman. And when first asked by police officers about any such conversation, Funk had similarly denied it. At trial, Funk, as an eyewitness to the multiple murders, was one of the State's key witnesses. The State called Funk to the stand to testify about the circumstances surrounding the murders, but never questioned Funk about such a conversation with Utzman. On cross-examination, defense counsel attempted to impeach Funk with inconsistencies between his cross-examination trial testimony, his deposition testimony, and his initial statements to police. In this regard, defense counsel succeeded in getting Funk to admit that he had indeed discussed the murders with Utzman, and thus he had lied in his deposition and to the officers. Defense counsel did not question Funk about the contents of his discussion with Utzman; the defense's goal here apparently was only to make out Funk as a liar for having denied any such discussion took place.

In response, the State sought to rehabilitate Funk's testimony by demonstrating that what Funk had told Utzman on March 29 was consistent with Funk's trial testimony. It did so by calling Utzman as a witness. Utzman testified that he had a conversation with Funk on March 29 and that in the course of this conversation, Funk said, "*I took the wrong ride. I was there when it happened.*" [9] (R. at 25,636–

---

7. The jury determined that Defendant committed the multiple murder aggravator under Indiana Code § 35-50-2-9(b)(8), allowing for the imposition of the death penalty.

8. A statement is not hearsay under Evid. R. 801(d)(1)(B)

> if [t]he declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... consistent with the declarant's testimony, offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, and made before the motive to fabricate arose.

*Id.*

9. On direct examination, Utzman testified to the following out-of-court statements made by Dale Funk about the shooting:

> [Prosecutor]: And on the way back [from Evansville], did you and Dale [Funk] have any conversation?
> [Utzman]: Yes, we did.
> [Prosecutor]: What did you talk about?
> [Utzman]: Ah, he was looking scared and nervous about ALCOA, and I asked him what was wrong with him.
> [Prosecutor]: Did he say he was looking scared and nervous about ALCOA? I didn't mean to interrupt you.
> [Utzman]: And I asked him what was wrong, and *he said that he took the wrong ride.* And I really didn't understand what he was saying at the time. But I said, "What do you mean," you know, and he said, "*Well, I took the wrong ride. I was there when it happened.*" And I didn't know what he was talking about.
> [Defense counsel]: Show objection to the question, Your Honor. It's hearsay

37) (emphasis added). Defense counsel immediately objected on grounds that Funk's out-of-court statements made to Utzman were inadmissible hearsay. The State replied that Utzman's testimony was admissible under Indiana Evidence Rule 801(d)(1)(B), and because the statements were not offered to prove the truth of the matter asserted, but rather offered to rehabilitate Funk's testimony. The trial court overruled defense counsel's objection without explanation.

Over defense counsel's continuing objection, the State was then allowed to elicit more testimony from Utzman about the March 29th conversation. Utzman further testified that Funk told him that when Defendant returned to the car after the shooting, Defendant asked Funk, "*'Did you see how many people was in [the truck] ?,'*" (R. at 25,646) (emphasis added). Utzman testified that Funk replied, "No." (*Id.*) After defense counsel's immediate objection to this testimony, the trial court sustained the objection "to that specific question." (R. at 25,646–47.) Utzman testified further that Funk said to him, "*after it was over, they got back in the car and they took the gun to someone's house.*" (R. at 25,647) (emphasis added). Defense counsel objected on the grounds of hearsay but the trial court allowed the testimony.

■ Defendant makes several challenges with respect to certain statements made by Utzman regarding Funk's out-of-court statements. He specifically argues that Utzman's testimony constituted inadmissible hearsay and did not fall under the non-hearsay evidentiary rules. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *See* Ind. Evidence Rule 801(c). Generally, hearsay is inadmissible. *See* Ind. Evidence Rule 802. However, a statement is not hearsay if it meets the requirements of Indiana Evidence Rule 801(d). Under Indiana Evidence Rule 801(d)(1)(B), a statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-

(R. at 25,636–37) (emphases added).

examination concerning the statement, and the statement is (1) consistent with the declarant's testimony, (2) offered to rebut an express or implied charge against the declarant or recent fabrication or improper influence or motive, and (3) made before the motive to fabricate arose. *See* Evid. R. 801(d)(1)(B). Trial court rulings on the admissibility of arguable hearsay statements are reviewed for abuse of discretion. *See Wright v. State*, 690 N.E.2d 1098, 1106 (Ind.1997), *reh'g denied.*

Defendant first contends that Funk's statement regarding the content of Defendant's purported question, "'Did you see how many people was in [the truck]?,'" was inadmissible double hearsay. However, the record clearly indicates that the trial court immediately sustained Defendant's objection as to this particular question. As such, Defendant cannot now claim error on appeal.

Defendant also contends that other testimony from Utzman regarding Funk's out-of-court statements, "I took the wrong ride. I was there when it happened," and "after it was over, *they* got back in the car and *they* took the gun to someone's house" constituted inadmissible hearsay. Appellant's Br. at 38–40 (emphases in original). He argues that this testimony was not saved by Evidence Rule 801(d)(1)(B) because (1) there was no charge of *recent* fabrication; and (2) Funk was an "admitted accomplice" at the time the murders occurred and so he had a motive to fabricate before he made statements to Utzman. Defendant also claims that Utzman's testimony as a whole improperly bolstered the credibility of Funk who "would otherwise have been [the State's] weakest witness." Appellant's Br. at 40; Reply Br. at 15.

Defendant concedes that Funk testified at trial and was subject to cross-examination regarding the statements. *See* Appellant's Br. at 39 (citing R. at 24,171, 24,320–

31, 24,459, 24,488–89). He also acknowledges, "Although there were inconsistencies between Funk's testimony and [Funk's prior out-of-court] statements to Utzman, this fact does not render the prior statements inadmissible for purposes of Evid. R. 801(d)(1)(B)." *Id.* (citing *Willoughby v. State*, 660 N.E.2d 570 (Ind. 1996)). Most of Funk's prior out-of-court statements made to Utzman were consistent with Funk's trial testimony in that they place blame on Defendant as the perpetrator while they portray Funk as a person having a much less significant role.

■ Defendant contends that the second criterion of the prior consistent statement rule was not met because the State did not offer Funk's statement to rebut a charge of *recent* fabrication. At trial, defense counsel argued, "We have not said, nor have we ever said that there is a recent fabrication. We ... argue that any fabrication here has been from the outset, not one that has been 'recent.'" Appellant's Br. at 39; Reply Br. at 14; R. at 25,641. However, the prior consistent statement rule is not limited to rebutting a charge of recent fabrication. The rule also encompasses efforts to rebut an express or implied charge of improper motive. In this appeal, Defendant expressly argues that Funk had a "*motive* to fabricate" to provide "substantive evidence of [Defendant's] guilt." Appellant's Br. at 40 (emphasis added). And at trial, defense counsel initiated questions regarding the March 29th conversation between Funk and Utzman in an effort to impeach Funk. It appears that this line of questioning sought to establish not only fabrication but also improper motive, i.e., a motive to shift blame on Defendant. The State properly offered to rebut this charge by utilizing Utzman's testimony. The second requirement of the prior consistent statement rule has been met.

The central issue is the third criterion of the rule—the *timing* of the claimed motive to fabricate. We agree with the United States Supreme Court in *Tome v. United States* which held that under Federal Evidence Rule 801(d)(1)(B), a declarant's consistent out-of-court statements may be admitted "to rebut a charge of recent fabrication or improper motive only when those statements were made before the charged recent fabrication or improper influence or motive." 513 U.S. 150, 167, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995).[10] The rationale behind the pre-motive rule is that if the consistent out-of-court statements were made before the motive to fabricate arose, we are assured that the statements were not "contrived as a consequence of that motive." *Id.* at 158, 115 S.Ct. 696. Here, Defendant argues that because Funk was an "admitted accomplice," Funk's improper motive to fabricate arose at the moment the triple murder occurred on March 28. Defendant further contends that because Funk uttered the statements to Utzman the next day, March 29, Funk made the statements *after* his motive to fabricate arose. As such, Defendant argues, the statements failed to meet the *Tome* temporal requirement and thus, were improperly admitted as hearsay.

This Court visited this issue in *Sturgeon v. State*, 719 N.E.2d 1173 (Ind.1999). In *Sturgeon*, a unanimous opinion authored by Chief Justice Shepard, we evaluated prior Indiana case law concerning the temporal requirement contained in the prior consistent statement rule and categorized the cases under two separate scenarios: (1) where the declarant was the defendant or equally culpable to the defendant in the crime, such as a co-defendant, and (2) where the declarant was involved before and after but not during the crime. *See*

10. This was the position of the five-justice majority as expressed in an opinion written by Justice Kennedy and joined by Justices, Stevens, Scalia, Souter, and Ginsburg. Chief Justice Rehnquist, and Justices O'Connor,

and Thomas, and Breyer would have allowed "relevant" consistent out-of-court statements admitted even after the motive to fabricate arose. *Tome*, 513 U.S. at 169, 115 S.Ct. 696 (Breyer, J. dissenting).

*Sturgeon,* 719 N.E.2d at 1179. Under the first category, we acknowledged that "[w]here the declarant was the defendant or co-defendant, *we have been willing* to conclude that a motive to fabricate likely arises immediately upon the commission of the crime." *Id.* (emphasis added) (citing *Bouye v. State,* 699 N.E.2d 620, 624–25 (Ind.1998); *Thompson v. State,* 690 N.E.2d 224, 232 n.8 (Ind.1997)).[11] In identifying the second category in *Sturgeon,* we said, "Where the declarant became involved in the crime *after* it was committed ... the role of timing is not as clear." *Id.* (emphasis added).

In short, there is no bright-line rule for determining whether or when a motive to fabricate has arisen even if the declarant was (1) equally culpable as the defendant, such as a co-defendant; (2) involved after the crime (as was the case in *Sturgeon*); or (3) arguably involved before, during, and after the crime like the declarant in this case. Determining the existence of a motive or when it arose is a fact-sensitive inquiry. *Id.* at 1178. In *Cline v. State,* 726 N.E.2d 1249 (Ind.2000), this Court also addressed the timing issue, and noted a significant passage from *Sturgeon:*

> "We acknowledge the possibility of a motive to fabricate on [the declarant's] part since he knew he could be charged in connection with the murder and since he participated in certain criminal acts surrounding the murder. However, *there is no evidence tending to implicate* [the declarant] in [the] murder and therefore no evidence that he had a motive to lie about [the defendant's] involvement when questioned. Without concrete evidence to that effect, we cannot conclude the trial court abused its discretion in admitting [the declarant's] prior consistent statement."

11. Defendant similarly relies upon our decisions in *Bouye* and *Thompson* to lend support to his argument that Funk, as an "admitted accomplice," had an improper motive to fabricate at the time of the murders. However, we also found that these two precedents do

*Id.* at 1253 (quoting *Sturgeon,* 719 N.E.2d at 1180) (emphasis added). As we determined in *Sturgeon* and reaffirmed in *Cline,* we will not override a trial court's decision to admit a prior consistent statement where there is no evidence "tending to implicate" the declarant in the crime.

In this case, although Funk was involved before, during, and after the murders occurred, the question of whether or not a motive to fabricate arose still remains a fact-sensitive inquiry. We find no substantial evidence here "tending to implicate" Funk in the triple murder which would lead to a conclusion that he had a motive to lie. Police officers testified that they did consider Funk a suspect at the time they questioned him on March 31. Funk testified that he feared prosecution because he accompanied Defendant throughout the crime spree of the burglary of Napier and Southard's mobile home and the pursuit of the victims in a car-chase, which ultimately led to the killings. However, Brian Mossberger, a friend of both Defendant and Funk, offered testimony which strongly implicated Defendant rather than Funk as the perpetrator. Further, Defendant owned the SKS assault rifle used to commit the killings. Forensic evidence revealed that the bullets used to kill the victims matched those shot from the murder weapon belonging to Defendant. We also find it significant that (1) the State never charged Funk of murder, (2) Funk did not receive any prosecutorial benefit in exchange for his testimony; and (3) Funk made the statements to Utzman the day immediately following the killings, which was two days before he was questioned by police.

Our extensive review of the evidence indicates that Funk had a limited role in the circumstances surrounding the murders. Therefore, we find that Funk had

not "require us to find a motive to fabricate, automatically, at the time the crime occurred or where the declarant has been questioned by the police in connection with the matter." *Sturgeon,* 719 N.E.2d at 1178.

no motive to fabricate within the meaning of Evidence Rule 801(d)(1)(B) when he uttered the statements to Utzman about the events surrounding the crime. We hold that the trial court did not abuse its discretion in overruling Defendant's hearsay objections.

## II

Defendant contends that the trial court committed reversible error when it denied his post-trial motion alleging newly discovered evidence of jury misconduct. He specifically claims that he was denied the right to confront witnesses and that he was denied a fair trial by an impartial jury because, unbeknownst to him, the jury foreman had prepared a notebook on his home computer and then used this notebook during jury deliberations.

At trial, the court instructed the jurors that they were allowed to take notes of the testimony, but admonished that note taking should not distract them from observing the credibility of the witnesses and listening to the evidence presented. Like other members of the jury, jury foreman Michael Fox took notes in open court of his daily observations of the trial without objection from defense counsel. Then in the evenings, Fox took his courtroom notes home with him and typed a narrative version of the trial on his personal computer. By the end of the trial, Juror Fox had prepared a 430–page typed notebook[12] supplemented with a 50–page timeline marking the sequence of events. When it came time for jury deliberation, Fox took the notebook into the jury room and relied on it a few times. Fox also discussed some of the notebook's contents with other jurors but none of the jurors actually read the notebook themselves.

Neither the trial court nor the parties had knowledge of Juror Fox's typed notes during the guilt-determination phase or penalty phase, or that Juror Fox had transcribed the notes at home. It was not until a September 1997, post-trial investigation that defense counsel discovered Juror Fox's notebook. Defense counsel then filed a "supplemental motion to correct error," alleging that these events constituted newly discovered evidence of juror misconduct. Counsel argued that Defendant's "constitutional right to a fair trial and impartial jury were violated when [the jury] was exposed to extraneous and prejudicial materials during guilt-innocent phase deliberations." Deft.'s Suppl. Mot. To Correct Errors at 2. In October, 1997, the trial court held a hearing on the matter and denied, without explanation, an original and the supplemental motion to correct error.

■ A party may file a motion to correct error when there is newly discovered evidence such as alleged juror misconduct. See Ind. Trial Rule 59(A); Mitchell v. State, 726 N.E.2d 1228, 1238 (Ind.2000), reh'g denied. When reviewing a trial court's denial of a motion to correct error on newly discovered evidence, our review is deferential and we will reverse only upon a showing of an abuse of discretion. See Slaton v. State, 510 N.E.2d 1343, 1347 (Ind.1987). The Defendant bears the burden of proving that the newly discovered evidence warrants a new trial. See Mitchell, 726 N.E.2d at 1238.

Defendant makes several challenges with respect to Juror Fox's notebook. He first contends that the notebook constituted "extraneous information" that unduly influenced other jurors. Appellant's Br. at 90, 92. In a related argument, Defendant claims that when Juror Fox typed a narrative version of the trial and time-line at home, he had improperly "deliberated, re-evaluated, and analyzed" the evidence. Id. at 83. Defendant maintains that such conduct violated the court's instructions for jurors not to reach conclusions "until

---

12. Apparently, Juror Fox was a former reporter and wanted to use the notebook as a "springboard for a creative writing project," such as a book or a journal. (R. at 32,523, 32,535.)

[they] have heard all the evidence, the argument of counsel, and final instructions." *Id.* at 87–90. Defendant argues that these events constituted juror misconduct that deprived him of his fundamental right to a fair trial under the state and federal constitutions. *Id.* at 93; Reply Br. at 36.

■ Generally, a verdict may not be impeached by evidence from jurors who returned it. *See Fox v. State*, 457 N.E.2d 1088, 1092 (Ind.1984). However, extrinsic or extraneous material brought into deliberation may be grounds for impeaching a verdict where there is a substantial possibility that such extrinsic material prejudiced the verdict. *See* Ind. Evidence Rule 606(b); *Mitchell*, 726 N.E.2d at 1238; *Bockting v. State*, 591 N.E.2d 576, 579 (Ind.Ct.App.1992), *transfer denied.* The burden is on the defendant to prove that material brought into the jury room was extrinsic. The burden then shifts to the State to prove it harmless. *See Taylor v. State*, 681 N.E.2d 1105, 1110 (Ind.1997).

■ It is now well-settled Indiana law that jurors are permitted to take notes during the course of a trial subject to the discretion of the trial court and its duty to ensure that jurors pay attention to all the evidence in the case. *See Chambers v. State*, 422 N.E.2d 1198, 1204 (Ind.1981); *Smith v. State*, 272 Ind. 34, 36, 395 N.E.2d 789, 790 (1979); *Dudley v. State*, 255 Ind. 176, 182, 263 N.E.2d 161, 164 (1970). This Court has further determined that a juror who records notes at home is a "closely related matter" to a juror who takes notes in the courtroom so long as no "communication to or from another person" has occurred. *Gann v. State*, 263 Ind. 297, 300–

1, 330 N.E.2d 88, 91 (1975). Thus, we have determined that both circumstances—taking notes during trial and transcribing notes at home—are appropriate provided that the juror pays attention to the evidence presented during trial and does not seek out any outside or extrinsic influences aimed to taint the notes.

■ The trial court properly instructed the jurors not to reach any conclusion before all the evidence had been presented and final instruction given. But as a practical matter, jurors cannot be prevented from reflecting upon witness testimony and other evidence after they leave the courtroom each day. In this case, it is undisputed that Juror Fox used his courtroom notes to compile and organize a narrative version of the trial and a corresponding time line on his home computer. However, there is no evidence demonstrating that Fox himself was exposed to extrinsic or outside influences, such as reading newspaper articles, watching a television program, researching on the Internet, or "communicating to or from another person" while compiling the notebook at home. At a post-trial hearing on the matter, Juror Fox testified that because he was "under Court order not to watch T.V.—local T.V., radio, or read the newspaper" he "sat at the computer" all evening typing his notes. (R. at 32,530.) Fox's testimony indicated that he did seek out extrinsic material but only *after the trial had ended* for purposes of editing, updating, and revising his notebook.[13] In order for jury misconduct to warrant a new trial, the defendant must show that the misconduct was gross and that it probably harmed the defendant. *See Carr*

---

**13.** The trial court held a post-trial hearing concerning Juror Fox's notebook. Fox testified before the court and explained that after the trial had ended, he explored the circumstances surrounding the case by reading newspaper articles and interviewing officers who testified at trial. Fox stated that while pursuing his research on the case, he had destroyed "more than half" of the original notebook by updating and revising the note-

book. Fox testified that he did not have a copy of the original notebook on file, saved on a floppy disk, or saved on his computer hard-drive. Because the original notebook could not be produced or re-produced at the post-trial hearing, the notebook admitted at the trial level and reviewed by this Court is not the same notebook taken into jury deliberation.

*v. State,* 728 N.E.2d 125, 131 (Ind.2000). We find that Defendant has not made a showing of gross misconduct. *See id.* at 131 (holding no jury misconduct where, during the defendant's trial, a juror accumulated newspapers but refrained from reading them until the trial had ended at which time the juror compared the news stories with her own trial notes.).

■ Without any evidence of extrinsic influence on Juror Fox during the course of the trial, we think that when he brought the notebook into jury deliberations, the contents of it were like those of any other juror-made notebook in this case—a reflection of a juror's personal observations of the trial, thoughts, and mental processes. In this case, the compiling and organizing of a notebook on a personal computer at home was a "closely related matter" to taking notes during the trial because the notebook, while elaborate in length and detail, was not tainted by extrinsic influences. Thus, the notebook itself when brought into the jury room did not amount to extraneous material. The fact that these perceptions regarding the trial were recorded at home and on a computer does not change our view because no outside information was sought or employed.

We find that Juror Fox did not disregard the trial court's instructions. The trial court instructed the jurors that they were allowed to take notes during the trial but gave no directive prohibiting re-writing, compiling, or organizing the notes at home. The trial court repeatedly instructed the jurors that they should listen to the evidence as it came from the witnesses, keep an open mind at all times, not form an opinion during the trial, and not reach a conclusion before hearing all the evidence, arguments of counsel, and the court's final instructions. We find no evidence in the record that Juror Fox did not follow these instructions.

Defendant argues further that the trial court improperly disregarded Indiana precedent which permitted only "limited or minor" note taking during a trial. Appellant's Br. at 82–84; Reply Br. at 34, 36 (citing *Miresso v. State,* 163 Ind.App. 231, 323 N.E.2d 249 (1975); *Dudley,* 255 Ind. at 182, 263 N.E.2d at 164; *Smith,* 272 Ind. at 36, 395 N.E.2d at 790).[14] With our increasing familiarity with juror note taking, we believe that the necessity of restricting jurors to limited or minor note taking has diminished. In any event, the cases cited by Defendant did not encompass the complexities of this case: the trial spanned over eight months during which the jury heard the testimony of 158 witnesses and observed 966 exhibits. This evidence presented at trial, along with numerous motions filed with the court, created a record of proceedings consisting of over 33,000 pages. It is likely that even very limited note taking would produce a substantial volume of material in such circumstances. Indeed, at least three other jurors in this case composed ten to twelve handwritten notebooks and used them during deliberations. The making of a lengthy notebook, especially where Defendant claimed no error with respect to the note taking of other jurors, did not constitute gross misconduct or irregularity on the part of Juror Fox.

Defendant also contends that Fox's notebook was tantamount to an "unofficial transcript[ ]" wrongfully brought into the jury room, and that the notebook resembled a "pseudo exhibit," which like other exhibits, should have been withheld from the jurors. Appellant's Br. at 84–85. Defendant also argues that the notebook amounted to "evidence" not supported by the record and that he did not have the opportunity to test the reliability and accu-

---

**14.** The principal concern addressed by theses cases was whether note taking distracted jurors from hearing all the testimony and paying attention to the credibility and demeanor of witnesses and whether the jurors relied too much on their notes rather than their memory. These cases held that at least limited or minor note taking could serve to keep the minds of jurors from wandering during trial.

---

racy of the notebook's content. *Id.* at 88. We reject this argument for the same reasons set forth *supra.* A juror's notes, typed or handwritten, organized or not, reflect the juror's own mental process and personal observations of the testimony and other evidence presented at trial. A juror's view of a case is not "evidence," does not function as an exhibit, and is not comparable to an unofficial transcript.

Finally, we find there is no evidence in the record that Juror Fox used the notebook inappropriately during deliberation. While in the jury room, Fox referred to his notebook only a few times for his own recollection. Although Fox discussed some of the information in the notebook with other jurors, no other members of the jury read the notebook themselves. Furthermore, Defendant did not seek and the trial court did not give any instruction prohibiting jurors from sharing or reviewing each other's notes. Accordingly, we have no basis for concluding that Juror Fox's use of the notebook during deliberations unduly influenced the other jurors.

The trial court did not abuse its discretion in denying Defendant's supplemental motion to correct error. *See, e.g., Hailey v. State,* 521 N.E.2d 1318, 1321 (Ind.1988) (holding that the trial court did not abuse its discretion in refusing to grant a new trial where a juror reviewed his notes during deliberation and discussed them with other members of the jury).

### III

Defendant contends that the trial court committed reversible error when it allowed opinion testimony from a crime scene technician and the coroner.

### A

During direct examination, the prosecuting attorney asked crime scene technician and Sergeant David Lee Anderson the reason why, in his opinion, he could find no hair, blood, or fiber in Defendant's vehicle when conducting his investigation. Sergeant Anderson replied, "The only plausible explanation I can come up with, sir, is someone would have had to have cleaned that vehicle in order that I wouldn't be able to find what I was looking for." (R. at 27,744.) Defendant objected.

Under Indiana Evidence Rule 701, when a non-expert provides an opinion, "the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." It is within the trial court's discretion to determine whether a witness is qualified to give an opinion. *See Angleton v. State,* 686 N.E.2d 803, 812 (Ind.1997) (citing *Kent v. State,* 675 N.E.2d 332, 338 (Ind.1996)), *reh'g denied.*

On appeal, Defendant argues that this testimony was improperly admitted as speculation because the Sergeant had no personal knowledge that Defendant cleaned his car after the commission of the crimes. *See* Appellant's Br. at 43. In support of his argument, he points to the testimony of one witness, Serologist Susan Laine, who stated that Defendant's car was " 'not clean,' " *see id.* (quoting R. at 28,791–93), and that other crime technicians testified that photographs taken before the vehicle was processed show " 'dirt, debris, and other material,' " *see id.* (quoting R. at 27,662–63). Defendant claims that "in light of this physical evidence, Anderson's opinion [was] not 'rationally based on his perceptions,' " as required by Indiana Evidence Rule 701(a), and he further maintains that Sergeant Anderson's opinion was conjecture and not helpful to the jury. *Id.* The State responds arguing that Sergeant Anderson's testimony was based on his "experience searching hundreds of cars," as well as "evidence that the interior of the car was damp or wet," and was therefore, properly admitted. Appellee's Br. at 19. We agree with the State.

■ Sergeant Anderson's testimony regarding the state of Defendant's vehicle was rationally based on his perceptions. Sergeant Anderson had been a member of the Indiana State Police for thirteen years and in law enforcement for 20 years; had been trained and continued to train in "photography, fingerprint techniques, firearms evidence ... trace evidence, serology, drugs, physical matches, ... and forensic entomology"; and he had worked as a crime scene technician for over eight years. (R. at 27,735–36.) Sergeant Anderson testified that over the course of eight years, he had "investigated hundreds of crime scenes," covering "well over a 100 every year." (R. at 27,743.) Sergeant Anderson provided further testimony regarding his investigation of Defendant's vehicle:

> It's extremely unusual not to find something indicative of someone having been [in a car]. Hair is the best example as any. Everyone loses hair ... But not finding hair in the vehicle was very unusual to me; not finding fiber was unusual.... I remember taking my hands across the floorboard—in the front of the vehicle, specifically I remember, and it felt damp. And I thought that to be sort of unusual as well. But at any rate, I suppose anything is possible, but it was very unusual to me that we found nothing in that vehicle.

(R. at 27,743–44.)

■ We find that Sergeant Anderson's conclusion that Defendant's car had been cleaned was "rationally based on his perceptions" of finding a damp floorboard and discovering no hair evidence in Defendant's car, and rationally based on his observations of numerous investigations of other vehicles. Furthermore, Evidence Rule 701 speaks to only those opinions or inferences "rationally based" on the witness's *own perceptions*, not those of others. Thus, the claimed contradictions between the testimony of Anderson and the serologist and other technicians are immaterial under the structure of this rule. Weighing the credibility of witnesses and drawing inferences and conclusions therefrom is within the jury's province. *See Taylor v. State*, 681 N.E.2d 1105, 1111 (Ind.1997).

We also find that Sergeant Anderson's testimony was helpful to the determination of a fact in issue. The reason Defendant's car was free from serological evidence such as hair and blood was an important factual issue for the jury to decide. Even though Sergeant Anderson's testimony was in conflict with photographs of dirt and debris found in the car, this did not render his opinion conjecture. The opinion was based upon his experience with many crime scene investigations and offered a plausible explanation for the condition of the car.

Defendant also argues that Sergeant Anderson's opinion was inadmissible under Indiana Evidence Rule 704(b) because the testimony indicated he had cleaned his car with the intent of deceiving police. Indiana Evidence Rule 704(b) provides in relevant part, "Witnesses may not testify to opinions concerning intent ... in a criminal case." However, Defendant did not object to this testimony as constituting an opinion concerning intent. As such, this claim is not available here.

### B

■ Defendant argues that the trial court committed reversible error "by permitting the coroner to offer [his] expert opinion on the time of death." Appellant's Br. at 44. He specifically argues that because the coroner testified that he was not qualified to give an "expert" opinion on the timing of death, his opinion was improperly admitted in violation of Indiana Evidence Rule 702.[15] *See id.* at 43–44.

---

15. Indiana Evidence Rule 702 allows testimony by experts where specialized knowledge will assist the trier of fact and the expert is qualified by knowledge, skill, experience, training or education. Whether or not an expert witness meets these requirements and

During the trial, the coroner testified that his duties consisted of "investigat[ing] all deaths and determin[ing] the manner and cause of death," (R. at 20,204); however he was not qualified to render an expert opinion concerning the *time* of the victims' death. He also testified that when he arrived at the crime scene, he observed the bodies' physical condition, noting the "degree of rigor mortis" [16] in the victims' joints and the body temperatures. The coroner testified further that shortly after he examined the bodies, Dr. John Heidingsfelder, a forensic pathologist, arrived on the scene and they discussed the coroner's personal observations regarding the condition of the bodies. Over Defendant's continuing objection, the coroner was allowed to offer his opinion that "the time of death could not have occurred before 9 p.m., nor could it have occurred after 2 a.m." (R. at 20,337A.) The basis of Defendant's objection was that the coroner lacked the qualification of an expert on the timing of death.

▪ Any error in allowing the testimony of the coroner was harmless. We will reverse only if the improper opinion testimony prejudiced the defendant. *See Taylor v. State*, 689 N.E.2d 699, 706 (Ind. 1997). The coroner's opinion was merely cumulative of other properly admitted testimony concerning the timing of the victims' death. Dr. Heidingsfelder was the physician who performed the autopsy on all three victims. Defendant agreed that Dr. Heidingsfelder was a qualified expert in the field of forensic pathology and the trial court ruled as such. When the prosecuting attorney asked Dr. Heidingsfelder his expert opinion as to the time of death, Dr. Heidingsfelder testified, without objection from Defendant, that the victims died "sometime after they were last seen alive

that night ... 9:00 or 10:00 p.m.," (R. at 22,522), and "prior to 2:00 in the morning," (R. at 22,521). Accordingly, we find that Defendant suffered no prejudice. *See, e.g., Hughes v. State*, 508 N.E.2d 1289, 1296–97 (Ind.Ct.App.1987) (ruling that in light of properly admitted expert opinion testimony by a certified physician concerning the cause of the victim's death, any error in the admission of an opinion by a second-year resident regarding the cause of death was harmless), *transfer denied. Accord Tope v. State*, 477 N.E.2d 873, 876 (Ind. 1985) (recognizing in a post-conviction proceeding that contradictory testimony of a non-expert coroner and forensic pathologist on the issue of timing of death would not have resulted in a different trial outcome warranting a new trial), *reh'g denied.*

## IV

Defendant contends that the trial court committed reversible error when it allowed evidence of Defendant's uncharged prior bad acts in violation of the court's order.

During the trial, State witness Troy Napier testified that he rented a garage repair shop where he and Defendant worked on cars together. While he was incarcerated in a Gibson County jail between February 1996, and April 1996, Napier thought there was no telephone service at the garage. However, a few months after his release in April 1996, Napier received a bill for telephone service and a calling card at the garage. Napier had neither requested telephone service at the garage nor asked for a calling card to be issued. Napier identified the telephone bill which was introduced as a State's exhibit.

Defendant objected to the admission of the telephone bill on grounds that the State was attempting to show that he had

should be allowed to testify is within the sound discretion of the trial court. *See Roach v. State*, 695 N.E.2d 934, 939 (Ind.1998), *reh'g granted on other grounds*, 711 N.E.2d 1237 (Ind.1999).

**16.** According to forensic pathologist Dr. Heidingsfelder, "rigor mortis is the stiffening that takes place in human skeletal muscle after death. It actually begins at the time of death [and] becomes perceivable or noticeable at about five (5) or six (6) hours after death." (R. at 22,449–50.)

installed the phone in Napier's name and without Napier's permission. Defendant argued that the State was alleging that he had committed forgery in violation of a court order *in limine* excluding evidence of prior bad acts or wrongs unrelated to the March 28, 1996, murders. Defendant also objected because the billing statement contained no name or address, it was incomplete. Based on the latter grounds, the trial court sustained Defendant's objection to the admission of the exhibit. The next day, the prosecuting attorney again questioned Napier about the billing statement. Defendant again objected, arguing that the court had already ruled on the matter. The trial court sustained the objection as to the admission of the exhibit, but allowed Napier to testify regarding his payment of the bill and request for service cancellation.

Defendant contends on appeal that although the trial court sustained the objection as to the admission of the telephone bill, the State's follow-up questioning the next day "was [an] attempt[ ] to show that [Defendant] had a phone installed in Napier's name through misrepresentation, and without any means or intention of paying the bill," Appellant's Br. at 47 (citing R. at 22,850–59). "Because this case involved the murder of three of [Defendant's] friends, evidence of how [Defendant] treated another friend was harmful and served to advance the impermissible inference." *Id.* at 50. Therefore, Defendant argues, the admission of the billing statement was in violation of a court order *in limine* to exclude character evidence under Indiana Evidence Rule 404(b).

■ Defendant's objections to the billing statement were sustained. The limited questioning that followed related only to Napier's own acts in canceling the service and seeking to have the charges cancelled. There was no evidence admitted as to Defendant's prior acts in this regard.

## V

Defendant contends that the trial court committed reversible error when it denied his motions for a mistrial. He claims that the prosecutor engaged in repeated acts of misconduct throughout the trial, which placed him in grave peril and thereby deprived him of his constitutional right to a fair trial.

■ In reviewing a claim of prosecutorial misconduct, we first determine whether the prosecutor engaged in misconduct, and then determine whether that misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which the defendant should not have been subjected. *See Wisehart v. State*, 693 N.E.2d 23, 57 (Ind.1998), *cert. denied*, 526 U.S. 1040, 119 S.Ct. 1338, 143 L.Ed.2d 502 (1999); *Cox v. State*, 696 N.E.2d 853, 859 (Ind.1998), *reh'g denied*; *Wright v. State*, 690 N.E.2d 1098, 1110 (Ind.1997), *reh'g denied*. The "gravity of peril" is measured by the " 'probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety of the conduct.' " *Wisehart*, 693 N.E.2d at 57 (quoting *Kent*, 675 N.E.2d at 335 (citing in turn *Bradley v. State*, 649 N.E.2d 100, 107–8 (Ind.1995), *reh'g denied* )). The trial judge is in the best position to gauge the surrounding circumstances and the potential impact on the jury when deciding whether a mistrial is appropriate. *See Tompkins v. State*, 669 N.E.2d 394, 398 (Ind.1996); *Roche v. State*, 596 N.E.2d 896, 902 (Ind.1992). Thus, the denial of a mistrial lies within the sound discretion of the trial court, and will be reversed only upon a finding of an abuse of discretion. *See Canaan v. State*, 541 N.E.2d 894, 908 (Ind.1989), *cert. denied*, 498 U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 185 (1990).

Defendant's first claim of prosecutorial misconduct is that the prosecutor improperly suggested that he had a duty to call witnesses and present evidence. During Defendant's cross-examination of a State witness, the prosecutor objected on

grounds that the questions were outside the scope of direct examination, and then stated, "This is a witness that is available to be called later by the State and by the defense." (R. at 21,166–67.) Defendant objected to the prosecutor's comments, and out of the presence of the jury, argued that such "comments suggested [that] he had a duty to call witnesses and present evidence." Appellant's Br. at 62 (citing R. at 21,167). Defendant then moved for a mistrial. The trial court denied the motion, but gave the jury an admonishment advising them that Defendant had no burden to prove his innocence or to present any evidence.

■■■■■ It is improper for a prosecutor to suggest that a defendant shoulders the burden of proof in a criminal case. *See Dobbins v. State,* 721 N.E.2d 867, 874 (Ind. 1999). However, a prosecutor's improper statements suggesting a defendant's failure to present witnesses may be cured by the trial court advising the jury that the defendant was not required to prove his innocence or to present any evidence. *See Chubb v. State,* 640 N.E.2d 44, 49 (Ind. 1994) (Preliminary instruction given to the jury just a few hours before prosecutorial impropriety occurred adequately cured prosecutor's comments regarding the defendant's failure to call witnesses.), *reh'g denied; Pettiford v. State,* 506 N.E.2d 1088, 1090 (Ind.1987) (Both preliminary and final instructions given to the jury overcame prosecutor's statements on the defendant's failure to present witnesses.).

■■■■ In the instant case, the trial court admonished the jurors shortly after Defendant's objection, advising them that Defendant had no burden to prove his innocence or to present any evidence. Defendant attempts to distinguish his case from *Chubb* and *Pettiford* by arguing that the admonishment failed to cure the impropriety because the trial court stated the prosecutor " 'may be correct.' " *See* Appellant's Br. at 63 (quoting R. at 21,186). We find the admonishment to be adequate. In addition, the trial court properly read preliminary instructions and final instructions advising the jury that Defendant was to be presumed innocent of the crimes charged and that the State bore the burden to prove Defendant guilty of each essential element of the crimes charged beyond a reasonable doubt. Both instructions also informed the jury that Defendant was not required to prove his innocence or to present any evidence. We presume that the jury followed these instructions. The State made only one comment suggesting that Defendant had an opportunity to call a witness and made no additional statements on the matter after Defendant's objection and the jury admonishment. Like our rulings in *Chubb* and *Pettiford,* we find that any misconduct here was *de minimis* and overcome by the court's preliminary instructions and final instructions, if not the court's immediate jury admonishment. The prosecutor's statement did not have a probable persuasive effect on the jury.

■■■ Defendant's second claim of prosecutorial misconduct is that the prosecutor improperly "allude[d] to inadmissible prior bad acts in front of [the] jury" in violation of the trial court's " 'Order on Comprehensive *Motion in Limine.*' " Appellant's Br. at 63 (quotations in original). During Defendant's cross-examination of a State witness, the prosecutor objected to Defendant's questioning pertaining to the witness's use of "crank." (R. at 23,212.) To support his objection, the prosecutor argued, "Unless I get to ask these kind of questions concerning the Defendant ... I do not know that this line of questioning has any relevance." (R. at 23,213.) Defendant objected to the prosecutor's comment, and out of the jury's presence, moved for a mistrial on grounds that the statement suggested that Defendant was involved in drugs.

The court ruled that although the prosecutor's comment was serious, it did "not rise to the level of placing the Defendant in grave peril in light of an appropriate

admonishment." (R. at 23,232.) The court then gave an admonishment instructing the jury to disregard the comment made by the prosecutor and that comments of counsel were not to be considered as evidence. The court further granted Defendant's request for individual *voir dire* on the matter, asking each juror, "Do you believe that you can make your decision in this case free from any influence from [the prosecutor's] comment." (R. at 23,237.) Each juror replied, "Yes." (R. at 23,237–43.)

We are satisfied that the trial court's admonishment cured any harm to Defendant as to this particular comment. However, Defendant argues further that the prosecutor's questioning of another State witness implied that Defendant was involved in drug trafficking, and that these repeated "suggestions" of drug use and selling drugs harmed Defendant. We treat this argument as Defendant's third claim of prosecutorial misconduct.

During cross-examination, Defendant asked State witness Detective Marvin Heilman whether in his investigation he discovered any visible means of income or support for various State witnesses. Then on re-direct examination, the prosecution posed the same question and also asked if he had uncovered any visible means of income or support for *Defendant.* At that point, Defendant objected, arguing that the implication of the prosecutor's question was "because [the Defendant] had no documented visible source of income, [he] must be making his living or income from some unlawful or illegal source." (R. at 28,568–69.) Therefore, Defendant argued, the prosecutor's question was in violation of the court's order *in limine* excluding bad character evidence. The Defendant then moved for a mistrial. The trial court denied Defendant's motion, but sustained Defendant's objection without admonishing the jury.

■ Our reading of the record indicates that the Detective did not answer the prosecutor's question in the presence of the jury and the jury heard no information about Defendant's income or job. Further, although the trial court gave no admonishment, it sustained Defendant's objection and the prosecutor complied with the court's ruling, asking no further questions on the matter. The prosecutor's question had no probable persuasive effect on the jury's decision. And even if the jury inferred that Defendant had no visible source of income, this information without more would not have established that Defendant's only alternative source of income arose from selling drugs or any other illegal activity. The prosecutor's question contained no references to "selling drugs" or "drug trafficking" or "drug business."

■ Defendant's fourth claim of prosecutorial misconduct is that the prosecutor improperly "discredit[ed] the conduct of defense counsel in front of the jury." Appellant's Br. at 65. During cross-examination, Defendant asked a State witness when the witness first received any statement that Defendant was directly involved in the murders of the victims. The prosecutor objected on hearsay grounds but the trial court overruled the objection. After Defendant repeated the question, the prosecutor interjected another objection stating, "Judge, as picky as we got on my direct examination of this witness, I think it's appropriate to be just as picky in the cross-examination of this witness." (R. at 23,653–54.) Defendant objected to the prosecutor's comment and moved for a mistrial.

We have recognized that prosecutorial statements attacking the defense counsel's integrity and competence are improper and inconsistent with the Rules of Professional Conduct which require lawyers to " 'demonstrate respect for the legal system and for those who serve it, including ... other lawyers.' " *Marcum v. State,* 725 N.E.2d 852, 858 (Ind.2000) (quoting Preamble, Ind. Professional Conduct Rules), *reh'g denied.* But given the brevity of the prosecutor's comment here, we

find that it did not have probable persuasive effect on the jury's decision.

Finally, Defendant contends that "[g]iven the closeness of the evidence, the prosecutor's repeated misconduct placed [Defendant] in grave peril." We disagree. Having found that any prosecutorial impropriety which may have occurred was *de minimis* or otherwise overcome by the trial court's admonishments and instructions, we are unable to conclude that Defendant was placed in grave peril.

## VI

Defendant's next argument is two-fold. First, Defendant contends that the trial court committed reversible error when it refused to allow Defendant to impeach State witness Brian Mossberger with evidence of three prior robbery convictions that were more than ten years old. Second, Defendant argues that the trial court's application of Indiana Evidence Rule 609(b) and the exclusion of such evidence infringed on his Sixth Amendment right to cross-examination.

Mossberger, one of two key State witnesses, testified to the events that occurred on the night of the murders implicating Defendant.[17] In an effort to attack Mossberger's credibility, Defendant sought to introduce impeachment evidence of Mossberger's three prior robbery convictions, all of which occurred in 1979. However, the trial court excluded the evidence, reasoning that Indiana Evidence Rule 609(b) prohibited evidence of convictions that were more than ten years old.

Generally, a proponent may seek to admit evidence of certain prior convictions of a witness to attack the credibility of that witness as long as the prior convictions are not more than ten years old. *See* Ind. Evidence Rule 609(a) and (b).[18] Evidence of a prior conviction that is more than ten years old may be admissible, however, if the proponent demonstrates that the probative value of the stale conviction evidence substantially outweighs its prejudicial effect, and the proponent gives the adverse party sufficient advance written notice of intent to use such evidence. Evid. R. 609(b). We review a trial court's ruling under Evid. R. 609(b) for abuse of discretion. *See Schwestak v. State,* 674 N.E.2d 962, 964 (Ind.1996).

This case is comparable to *Schwestak* in which this Court upheld a trial court's decision preventing a defendant from introducing a State witness's prior burglary conviction that was more than ten years old. *Id.* at 963. There, we reasoned that the defendant did not demonstrate

> why the *probative value of this conviction, which [was] more than ten years old, [was] so high as to overcome the general rule that stale convictions are not admissible.* Defendant d[id] not offer any reason other than that [the State witness's] testimony was a very important part of the State's case. Although [the State witness's] testimony was indeed an important part of the State's case, it certainly was not dispositive. The State introduced ample other evidence establishing [the] defendant's guilt.

*Id.* at 964. (emphasis added).

Defendant attempts to distinguish his case from *Schwestak* by arguing that

---

17. According to Mossberger's testimony, Defendant went to Mossberger's house, held a knife by his (Defendant's) face, and said, "Jay, Kathy, and Brandy are no more." (R. at 24,674–75.) Mossberger also testified that Defendant instructed him to "[d]o something with the SKS; get rid of it; make it gone." (R. at 24,678.) Mossberger said that he complied with Defendant's demand and buried the assault rifle and ammunition in the woods the next day. (R. at 24,752–53, 24,770, 24,-798–99.)

18. Indiana Evidence Rule 609(a) states:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime or an attempt of a crime shall be admitted but only if the crime committed or attempted is (1) murder, treason, rape, robbery, kidnapping, burglary, arson, criminal confinement or perjury; or (2) a crime involving dishonesty or false imprisonment.

Mossberger's testimony "was essential to the State's case, and dispositive on many issues" because Mossberger was the only witness to testify that Defendant (1) told him to get rid of the murder weapon and ammunition; and (2) admitted to his role in the murders by stating that one of the victims should not have been there. *See* Appellant's Br. at 33. As such, Defendant claims "Mossberger's believability was crucial to the determination of substantive facts surrounding these crimes, and central to [Defendant's] conviction." *Id.*

Mossberger's prior robbery convictions occurred in 1979, which was approximately seventeen years from the date the trial began in September 1996. Therefore, to demonstrate that the trial court abused its discretion in excluding such evidence, Defendant has the burden of showing that the "probative value of [the] conviction[s], which [are] more than ten years old, is so high as to overcome the general rule that stale convictions are not admissible." *Schwestak,* 674 N.E.2d at 964. Defendant has not met this burden.

■ While we recognize the importance of Mossberger's testimony to the State's case, we disagree with Defendant that Mossberger's credibility was a dispositive factor. As to the facts at issue here, Mossberger's testimony corroborated the testimony of Dale Funk. As discussed in part I, *supra,* Funk was the key witness for the State, who testified that he observed Defendant "hand[ ] the gun to [Mossberger]; told him to get rid of it." (R. at 23,982.) In fact, Funk testified that he was an eyewitness to the murders and identified Defendant as the perpetrator who shot and killed the three victims with an assault rifle. It does not appear to us that seventeen-year-old robbery convictions undermine in any meaningful way the credibility of this corroborating testimony. We do not find the probative value of Mossberger's seventeen-year-old robbery convictions so high as to overcome the general rule that stale convictions are not admissible.

Defendant also contends that the "trial court's mechanistic application of the staleness provision in Rule 609 violated [Defendant's] state and federal constitutional right to cross-examination and a fair trial." Appellant's Br. at 35 (citing U.S. Const. Amends. VI and XIV and Ind. Const. art. 1, § 13).

■ "[O]ne of the fundamental rights of our criminal justice system granted by the United States Constitution and the Indiana Constitution is the right of a defendant to cross-examination." *Pigg v. State,* 603 N.E.2d 154, 155 (Ind.1992) (citing to *Sears v. State,* 258 Ind. 561, 563, 282 N.E.2d 807, 808 (1972)). While a Sixth Amendment issue is raised when a defendant is prohibited from cross-examining a crucial witness for the State on an area of his credibility, *see Crull v. State,* 540 N.E.2d 1195, 1198–1200 (Ind.1989); *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Davis v. Alaska,* 415 U.S. 308, 315–18, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the right to cross-examination is not absolute and is not without limitation, *see Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431 (reaffirming that the Sixth Amendment " 'guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish' ") (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)) (emphasis in original).

■ At issue in this case is whether the trial court's application of Evidence Rule 609(b) denied Defendant his constitutional right to cross-examine a witness on an area of credibility. Defendant argues that such application "prevented [Defendant] from cross-examining Mossberger about, and presenting evidence of, impeaching felony convictions which directly correlated with his propensity to tell the truth." Appellant's Br. at 36. We disagree and find that the trial court's application of Rule 609(b) did not prevent De-

fendant from cross-examining Mossberger and attacking his credibility. Defendant conducted a thorough cross-examination of Mossberger which consisted of at least 500 pages of record. Defendant further acknowledges in his brief that he "was able to expose some of Mossberger's evasiveness, selective memory, and lies." Appellant's Br. at 33. Because Defendant was permitted to cross-examine on Mossberger's credibility in some extended detail, we find that the exclusion his seventeen-year-old convictions did not amount to a denial of Defendant's constitutional right to cross-examination.

## VII

Defendant contends that the trial court violated his statutory right to a speedy trial under Indiana Criminal Rule 4(B)(1) when it failed to try him within 70 days of May 15, 1996, the date that Defendant filed his motion for a speedy trial. He specifically argues that the State's late production of discovery material forced him to move for continuances on three separate occasions and thus the trial court improperly attributed the elapsed time to him.[19] Defendant therefore argues that his convictions should be reversed and that he is entitled to discharge.

■ The chronology of trial events indicate that Defendant filed a speedy trial motion on May 15, 1996, and the court properly set a trial date for July 22, 1996—a time within the 70–day period required by Criminal Rule 4(B)(1).[20] On June 17, 1996, only 34 days into the speedy trial period, Defendant filed a motion to dismiss on grounds of a Criminal Rule 4(B)(1) violation. The trial court denied the motion.[21]

Defendant filed three separate requests for continuances over a course of fourteen days. On July 19, 1996, a few days before trial, Defendant moved for a continuance requesting a one-week delay and further sought to charge the delay against the State because the State had not complied with his discovery requests.[22] At a July 19th hearing, the trial court ruled against charging the State with the delay, reason-

19. Defendant also claims that he was compelled to choose between his constitutional right to a fair trial and his constitutional right to a speedy trial. However, he does not develop this claim further. *See Ind. Appellate Rule* 8.3(A)(7).

20. Crim. R. 4(B)(1) provides:

If any defendant held in jail on an indictment or an affidavit shall move for an early trial, he shall be discharged if not brought to trial within seventy (70) calendar days from the date of such motion, except where a continuance within said period is had on his motion, or the delay is otherwise caused by his act, or where there was not sufficient time to try him during such seventy (70) calendar days because of the congestion of the court calendar. Provided, however, that in the last-mentioned circumstance, the prosecuting attorney shall file a timely motion for continuance as set forth in subdivision (A) of this rule. Provided further, that a trial court may take note of congestion or an emergency without the necessity of a motion, and upon so finding may order a continuance. Any continuance granted due to a congested calendar or emergency shall be reduced to an order, which order shall

also set the case for trial within a reasonable time.

21. It is well established that when a motion for discharge for a Criminal Rule 4 violation is made prematurely, it is properly denied. *See Bell v. State*, 622 N.E.2d 450 (Ind.1993); *Perry v. State*, 471 N.E.2d 270, 273 (Ind.1984). As such, the trial court in this case properly denied Defendant's motion to dismiss which was prematurely filed 34 days into the speedy trial period.

22. In his first motion for continuance, Defendant argued, *inter alia*, that as of July 19, 1996, the State had not allowed Defendant access to the murder weapon. Defendant further claimed that the State had yet to complete its analysis of hair, blood, and fiber samples for Defendant's independent review and inspection. On July 24, 1996, Defendant requested a court order instructing the State to release the murder weapon and shell casings for testing by a defense expert. The trial court granted the motion, ordering the State to either release such evidence to Defendant's agents or make it available for testing at the Warrick County Security Center. The State promptly complied with the court order.

ing that both the State and Defendant "made respectful attempts to comply with the orders of the Court," and then denied Defendant's motion. (R. at 7,491.) Immediately after the court's ruling, Defendant again moved for a continuance, a motion identical to the first except that it did not request that the delay be charged against the State. The State responded that it was "ready to go to trial" as scheduled but had no objection to the motion. (R. at 7,492–93.) The court granted Defendant's motion to reschedule the trial for July 29, 1996.

On July 26, 1996, the trial court granted Defendant's new request to reschedule the trial. At a hearing on the matter, the State stated that there was more to be done but that it was "ready to go to trial." (R. at 8,543.) On August 1, 1996, Defendant again moved for a continuance. The trial court granted the request and rescheduled the trial to begin on September 23, 1996, which was the only available date on the trial court's calendar. On August 22, 1996, Defendant filed another motion to dismiss because he was not brought to trial within 70 days from the date he filed his motion for a speedy trial. At a September 17, 1996, hearing, the trial court denied this motion to dismiss.

Indiana Rule of Criminal Procedure 4(B)(1) provides that "[i]f any defendant held in jail on an indictment or an affidavit shall move for an early trial, he shall be discharged if not brought to trial within seventy (70) calendar days from the date of such motion...." The trial court may set a trial date beyond this prescribed time when there is a continuance or delay by the defendant, court congestion, or an emergency. As such, when a defendant requests a continuance, the elapsed period

between his motion for a continuance and the new trial date is generally chargeable to the defendant. *See Vermillion v. State*, 719 N.E.2d 1201, 1204 (Ind.1999), *reh'g denied*. However, as Defendant correctly points out, we have found that when a defendant moves for a continuance because of the State's failure to respond to discovery requests, the delay can be attributable to the State. *See Isaacs v. State*, 673 N.E.2d 757, 762 (Ind.1996) (citing *Biggs v. State*, 546 N.E.2d 1271, 1275 (Ind.Ct.App. 1989)).

■ At the July 19th pre-trial hearing on the first continuance, Defendant made no objection to the trial court's decision not to charge the delay against the State. Rather than raising an objection to the court's ruling, Defendant renewed the motion for continuance without requesting that the delay be attributed to the State. A defendant who permits the court, without objection, to set a trial date outside the 70–day limit is considered to have waived any speedy trial request. *See Goudy v. State*, 689 N.E.2d 686, 691 (Ind.1997).

This waiver notwithstanding, we consider Defendant's two other continuances. At the July 26th pre-trial hearing on the second motion for continuance, Defendant argued that laboratory tests for hair comparisons were not completed by the State. However, Defendant conceded that the lab technicians were "working as fast as [they] can." (R. at 8,540.) He further acknowledged that new information had recently come to light which required him to ask for additional time to re-depose two or three different witnesses.[23] Because Defendant needed additional time to prepare for trial, the elapsed time resulting from the second trial continuance was rightfully charged to Defendant. With respect to

---

**23.** Defense counsel stated:

We received additional information [on July 25th] that is going to require the re-deposing of at least two (2) witnesses, and perhaps three (3), based on information that was not divulged in the first deposition ... I think the State is aware of what I'm speaking of ... it's not something that [the

State] contrived or done[sic] willfully ... but [the depositions] just have to be done. And we're in a situation with that, trying then to move into a mode to prepare the final motions that are going to have to be ... filed.

(R. at 8,541.)

Defendant's third motion for continuance, 54 days of the delay (the period between the date of Defendant's third continuance on August 1, 1996, and the date of the trial on September 23, 1996) were attributable to neither the State nor Defendant. The court warned both parties that because of court congestion, the next available trial date on the court's calendar was not until September 23, 1996, and neither party objected to the revised schedule. Defendant did not dispute the trial court's finding of court congestion in his motion for discharge or on appeal. As such, we will presume that the trial court's finding of court congestion is valid, and that no contemporaneous explanation or documentation was needed. *See Clark v. State,* 659 N.E.2d 548, 552 (Ind.1995).

Finally, we recognize that in a death penalty case of this magnitude even the most capable attorneys would be hard pressed to complete all discovery requests before the tolling of a speedy trial period. This Court recently gave particular attention to death penalty cases subject to the time constraints of Criminal Rule 4 in *Lowrimore v. State,* 728 N.E.2d 860 (Ind. 2000), *reh'g denied.* In that case, we said, "The values of Criminal Rule 4 are important, but so long as constitutional speedy trial standards are met, these values must yield to the exigencies created by the death penalty charge if the two cannot be reconciled." *Id.* at 866. We believe that principle also applies to the circumstances presented here. Attorneys on both sides were under considerable time pressures to prepare a capital case involving the murders of three victims, the presentation of 158 witnesses, and the introduction of 966 exhibits. Not surprisingly, the record reveals that discovery continued long after the trial commenced on September 23. While there may have been delays in the State's response to some discovery requests in question because of laboratory delays, we find no basis to disagree with the State's assertion at trial that it "made every effort to comply with discovery or-

ders of the Court." (R. at 7,490.) In light of the tremendous discovery challenges brought on by a death penalty case of this scale, we agree with the trial court's initial finding that both parties made respectable attempts to comply with court orders. Defendant is not entitled to discharge.

## VIII

Defendant contends that the following "proceedings were illegally conducted outside [Defendant's] and his counsel's presence": (1) a conference between the judge and the prosecutor regarding the State's request to delay the trial one week in order to investigate an alleged confession to the murders made by someone other than Defendant; (2) a written communication between the judge and jury during deliberations in the guilt-determination phase; and (3) a jury viewing of the crime scene. Appellant's Br. at 50. Defendant argues that his absence and the absence of his attorneys violated his right to be present at all "critical stages" of his trial and entitles him to reversal of his convictions.

Defendant cites to three different sources for his right to be present: the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, § 13, of the Indiana Constitution. In *Ridley v. State,* we clarified that these constitutional sources guarantee a defendant's right to be present but that they are not identical. 690 N.E.2d 177, 180 (Ind.1997). As such, we discuss each separately.

## A

Defendant first contends that he was denied his constitutional right to be present under the federal and state constitutions when the judge and the prosecutor met with each other in Defendant and Defendant's attorney's absence without notice.

The pertinent facts surrounding the judge-prosecutor *ex parte* conference indicate that during the trial on January 2, 1997, prosecutors met with the trial judge in the judge's office, outside the presence

of Defendant and his attorneys. Immediately thereafter, counsel on both sides participated in an *in camera* hearing in which the State requested a one-week continuance and the temporary tolling of discovery obligations. Defendant objected to any continuance but had no basis for the objection simply because neither the prosecutor nor the judge disclosed the subject matter of the *ex parte* communication. Defendant demanded to know the nature of the communication but the judge denied this request. The prosecutor argued, without legal authority, that the information was "privileged and confidential." (R. at 19,814.) Defendant sought, but was denied, a mistrial.

On January 6, the judge made a written account of the *ex parte* communication with the prosecutor. According to the judge's report, the prosecutor divulged that a person other than Defendant had admitted to shooting the Tylers and Southard. At this time, the State supplied Defendant with two supplemental case reports disclosing the results of its investigation. The reports revealed that Officer Heilman learned on December 27, 1996, that Robert Smith told Vanderburgh County Police that he overheard someone else confess to the murders for which Defendant was currently being tried. Smith also suggested that the murders were committed in retaliation for a drug debt owed to Herschel Seifert by the Southard's fiancé, Troy Napier.

The essence of Defendant's argument is that if he had been present during the *ex parte* proceeding, Smith's story would have been disclosed to him and he could have presented a "meaningful argument at a meaningful time . . . against the continuance" requested by the State. Appellant's Br. at 54. Defendant also maintains that "[t]he subject of this *ex parte* proceeding was information about a person who over-

heard someone else confess to the killings for which [he] was on trial. That information directly contradicted the story told by Funk, and provided the missing motive behind the killings. Keeping this information from [him] ultimately hampered his defense." *Id.* at 55.

We agree with Defendant that he was entitled to know the reason the prosecutor requested the continuance. It was not appropriate for the trial court to place Defendant in a position of having to respond to the requested continuance when the reason for it was secret.[24] However, we find the trial court's error in this regard to be harmless. We also hold that no violation occurred under either the Sixth Amendment or Due Process Clause of the Fourteenth Amendment.

Defendant was entitled to any information in the State's possession concerning another's confession to the murders for which Defendant was being tried. However, Defendant has not shown how his inability to have this information in order to oppose the State's continuance request adversely affected his substantial rights. *See Fleener v. State*, 656 N.E.2d 1140, 1142 (Ind.1995) (ruling that errors in the application of state evidentiary or procedural law will be found harmless if their probable impact is sufficiently minor so as not to affect the substantial rights of the parties). Defendant acknowledges that only one week after the *ex parte* communication, the State made available two supplemental case reports disclosing the details of Smith's story. *See* Appellant's Br. at 53 (citing R. at 2,513, 3,647–48, Appendix 30–31.) The judge then properly granted Defendant a continuance allowing him sufficient time to review this newly discovered information, and to "pursue any avenues raised by its disclosure and to adjust its strategy accordingly." *Dye v. State*, 717 N.E.2d 5, 12 (Ind.1999), *cert. denied*, ——

---

**24.** We express no opinion on the amount of detail the prosecutor was required to disclose in support of the requested continuance. In certain continuances, it will be appropriate

for a party when requesting a continuance to ask the court to review supporting documentation *in camera*.

U.S. ——, 121 S.Ct. 379, 148 L.Ed.2d 292 (2000). The record further indicates that defense counsel deposed Smith before the trial reconvened and that counsel read aloud Smith's sworn testimony in front of the jury. As such, the jury did hear Smith's testimony which directly contradicted Funk's inculpatory testimony against Defendant. We conclude that the impact of the *ex parte* communication was sufficiently minor so as not to have affected the substantial rights of Defendant.

Defendant also contends that the *ex parte* communication violated his constitutional rights in several respects.

First, Defendant claims his Sixth Amendment right to be present in the courtroom at every stage of his trial was violated. This right is rooted in the Confrontation Clause. *Ridley*, 690 N.E.2d at 180 (citing *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)). A Confrontation Clause violation occurs when witnesses or hearsay evidence are presented in the defendant's absence that affect the defendant's opportunity for cross-examination. *See Kentucky v. Stincer*, 482 U.S. 730, 737–38, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987). In the present case, the judge-prosecutor *ex parte* communication did not involve the presentation of witnesses or evidence against Defendant. Defendant's right to cross-examine witnesses under the Confrontation Clause was not implicated because no witnesses were present during the meeting held in Defendant's absence. *See id.* Accordingly, we find that there was no Sixth Amendment violation.

Second, Defendant raises an argument under the Due Process Clause of the Fourteenth Amendment, contending that the State failed to disclose Smith's story about the alleged confession which was in direct violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). · *See* Appellant's Br. at 54, 56. Due process requires the State to disclose to the defendant favorable evi-

dence which is material to either his guilt or punishment. *See Brady*, 373 U.S. at 87, 83 S.Ct. 1194; *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Under *Brady*, favorable evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (analyzing *Brady*). In this case, we find that no *Brady* violation occurred because Smith's story was disclosed to Defendant only a week following the *ex parte* communication and became known to the jury before the conclusion of the trial. *See Williams v. State*, 714 N.E.2d 644, 648–49 (Ind.1999) (recognizing that if the favorable evidence becomes known to the defendant before or *during* the course of a trial, *Brady* is not implicated) (citing *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)), *cert. denied*, 528 U.S. 1170, 120 S.Ct. 1195, 145 L.Ed.2d 1099 (2000); *Dye*, 717 N.E.2d at 12 (same); *Braswell v. State*, 550 N.E.2d 1280, 1283 (Ind.1990) (same).

Finally, Defendant argues that his right to be present at every stage of a criminal proceeding under Article 1, § 13, of the Indiana Constitution was violated. But that right only applies to situations where the jury's presence is required. As the jury's presence was not required during the judge-prosecutor communication, the Indiana constitution was not violated. *See Ridley*, 690 N.E.2d at 181 n.4.

**B**

Defendant also contends that the trial court erred in violating his "federal and state constitutional rights to be present and be heard in person and by counsel at all stages of his trial," when "the jury and judge exchanged written communications" during jury deliberations in the guilt-determination phase. Appellant's Br. at 51.

For this *ex parte* claim, Defendant relies upon two sources for his right to be present: the Sixth Amendment under the United States Constitution and Article 1, § 13, of the Indiana Constitution.

After retiring for deliberations, the jury sent a written note to the bailiff who in turn handed the note to the judge. The note read as follows: "We would like to listen to [Defendant's] tape 4810. Can we see the depositions of Brian M. & Dale .Funk?" (R. at 3,725.) The trial court "advised the [b]ailiff to tell the jury that the court could not provide the items requested [by] them." (R. at 3,842.) The trial court reported, "The [j]ury then continued its deliberations and no further requests were received prior to reaching their verdicts." (*Id.*) Both parties were advised of the judge-jury communication sometime later.[25]

Case law recognizes state constitutional protection for a defendant's right to be present when a jury makes a request for any additional guidance during deliberations. *See Pendergrass v. State*, 702 N.E.2d 716, 718–20 (Ind.1998). This Court has repeatedly laid out the procedural guidelines for a trial court to follow when confronted with such a situation. *See id.* at 718–20; *Bouye v. State*, 699 N.E.2d 620, 628 (Ind.1998). Under this procedure trial court should

"notify the parties so they may be present in court and informed of the court's proposed response to the jury *before* the judge ever communicates with the jury. When this procedure is not followed, it is an *ex parte* communication and such communications between the judge and the jury without informing the defendant are forbidden. However, although an *ex parte* communication creates a presumption of error, such presumption is rebuttable and does not constitute *per se* grounds for reversal. When a trial judge responds to the jury's request by denying it, any inference of prejudice is rebutted and any error deemed harmless."

*Pendergrass*, 702 N.E.2d at 719–20 (quoting *Bouye*, 699 N.E.2d at 628) (emphases in original) (citations omitted).

In the instant case, the trial judge erred in not notifying the parties before communicating to the jury. However, the judge merely denied the jury's request to listen to Defendant's taped statement for a second time and to review depositions that were already read into evidence; therefore, any error resulting from this communication was harmless. *See Marsillett v. State*, 495 N.E.2d 699, 709 (Ind.1986) (holding that a judge-jury communication outside the defendant's

25. Our review of the record indicates that the court reporter and lead defense counsel engaged in a conversation in which the court reporter informed counsel that the jury had requested Defendant's taped statement to police. (R. at 3,772–73, 3,790, 3,808–09.) However, defense counsel neither objected nor asserted his concerns before the trial court. (*Id.*) The facts are in dispute, however, as to whether the court reporter informed counsel about the jury's request for the depositions of Funk and Mossberger. The court reporter provided a sworn affidavit dated September 4, 1997, which states in relevant part:

That whenever [defense counsel] returned to the Courthouse after being notified that the Jury in the above-captioned cause of action had reached a verdict, but before counsel for the State had arrived and before the verdict was received from the Jury, [de-

fense counsel] asked if the Jury had requested any exhibits during their deliberation. *I advised him [that] the Jury had requested Defendant's taped statement, and the depositions . of Brian Mossberger and Dale Funk....* [Defense counsel] stated he did not believe the State would have had a case without his client's statement, *and [defense counsel] did not indicate any objection to me or the judge as to the way the matter was handled.*

(R. at 3,809) (emphases added).

In contrast, Defendant claims that the court reporter only informed him of the jury's request to listen to Defendant's taped statement, and it was only after he read the State's response to Defendant's motion to correct errors that he learned of the jury's request to see the depositions. The record of proceedings is unclear as to when or how the State was advised about the communication.

presence constituted harmless error where the judge merely denied the jury's request to replay part of a transcript); *see also Brewer v. State,* 605 N.E.2d 181, 184 (Ind. 1993) (ruling that where a trial court simply denied a jury's request for more information in the defendant's absence, such communication did not result in prejudice to the defendant and any error was harmless).

Defendant also contends that his absence "prevented [him] from being heard by counsel as to the importance of allowing the jury to listen to the taped statement." Appellant's Br. at 59. He argues that the "subject matter [of the jury's note] was some of the most crucial evidence presented," and that "[i]t would be reasonable to conclude jurors might need to refresh their recollections about the most pivotal evidence presented." *Id.* As we stated in response to an almost identical assertion in *Bouye,* "[c]ontrary to the defendant's argument, the prohibition against *ex parte* communication is not designed to give the defendant an opportunity to provide the jury with more information that might benefit his case, but rather it is designed to prevent the jury from being improperly influenced by the judge. The defendant's contention fails." 699 N.E.2d at 628–29.

With respect to Defendant's other argument on the right to be present, he contends that the "federal constitutional right[ ] to be heard by counsel and to have counsel's assistance [is] implicated by . . . an *ex parte* communication even where the judge ultimately refuses communication." Appellant's Br. at 59. However, Defendant merely cites to the Sixth Amendment [26] without developing the argument further. *See* Ind. Appellate Rule 8.3(A)(7).

## C

Finally, Defendant argues that the jury's view of the crime scene was illegally

conducted outside his and his counsel's presence.

Over Defendant's objection, the trial court granted the State's request for the jury to view various locations pursuant to Indiana Code § 35–37–2–5, which allows a "jury to have a view of the place in which any material fact occurred." In particular, the bailiff accompanied the jury to see Mossberger's home; the railroad crossing on Red Brush Road; Napier's mobile home where the burglary occurred prior to the murders; and the intersection of Youngblood and Eble Roads where the commission of the murders took place. Before the viewing, the trial court's instructions advised the jury that the "various locations of the jury viewing [were] not to be considered as evidence," (R. at 31,- 543), and to "remain on [the] bus and on public right of way at all times," (R. at 31,545). Both parties agreed to these instructions.

Defendant specifically argues on appeal that the places viewed by the jury in Defendant's absence constituted "evidence." Defendant maintains that because he was absent during "presentation of evidence," his right to be present was in violation of the Sixth and Fourteenth Amendments of the United States Constitution, and Article 1, § 13, of the Indiana Constitution. Appellant's Br. at 57–58. Defendant did not make a request to the trial court to accompany the jury during the viewing and was never barred from doing so. Thus, he cannot now claim error on appellate review that he was denied his constitutional rights to be present. Nevertheless, it is well settled Indiana law that a jury's view of a location is not evidence, but rather it is intended to aid a jury's understanding of evidence presented at trial. *See Jackson v. State,* 597 N.E.2d 950, 962 (Ind.1992), *cert. denied,* 507 U.S. 976, 113 S.Ct. 1424, 122 L.Ed.2d 793 (1993); *Johnson v. State,* 472 N.E.2d 892, 909 (Ind.1985); *Mears v. State,* 455 N.E.2d

---

26. For a discussion of a defendant's right to be present under the Sixth and Fourteenth Amendments under the federal constitution in

the context of a judge-jury *ex parte* communication, see *Pendergrass,* 702 N.E.2d at 718–19 n.3.

603, 605 (Ind.1983). Because neither evidence nor witnesses were presented in Defendant's or his counsel's absence, his rights under the Confrontation Clause of the Sixth Amendment were not implicated. *See* part VIII.A, *supra.* Furthermore, Defendant merely cites to the Indiana constitution and the Fourteenth Amendment and did not develop the argument further. App. R. 8.3(A)(7).

## IX

Defendant contends that the trial court erred by admitting several autopsy photographs of the victims' internal organs because the cause of death was uncontested and the photographs depicted the bodies in an "altered" condition and therefore unduly prejudiced the jury. *See* Appellant's Br. at 66. He argues that the photographic evidence had "no real probative value" and that they only served to inflame the emotions of the jury. *See id.* at 70.

■■■ Photographs, including those that are gruesome in nature, are admissible if they act as interpretive aids for the jury and have strong probative value. *Wright v. State,* 730 N.E.2d 713, 720 (Ind. 2000) (citing *Harrison v. State,* 699 N.E.2d 645, 647 (Ind.1998)), *Spencer v. State,* 703 N.E.2d 1053, 1057 (Ind.1999). Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. To exclude photographs from evidence on relevancy grounds, the defendant must show that their improper influence on the jury substantially outweighed their probative value to the extent that they were unduly prejudicial. *See* Ind. Evidence Rule 403; *Spencer,* 703 N.E.2d at 1057; *Mitchell v. State,* 726 N.E.2d 1228, 1237 (Ind.2000), *reh'g denied.* We review the trial court's admission of photographic evidence for an abuse of discretion. *See Cutter v. State,* 725 N.E.2d 401, 406 (Ind.2000), *reh'g denied.*

In this case, Defendant attacks the admission of the following three photographs of *Brandy Southard:* State's Exhibit No. 2995 depicted the rib cage and muscles; Exhibit No. 2998 viewed the inside of the chest after the rib cage and breast bone were removed; and Exhibit 3003 displayed the heart and aorta. Defendant also challenges the admission of the following three photographs of *Kathy Tyler:* (1) Exhibit No. 2906 showed Kathy Tyler's left lung; (2) Exhibit No. 3072 revealed a windpipe and voice box; and (3) Exhibit No. 3036 pictured the inside of the chest wall after the organs had been removed. Finally, Defendant takes issue with the admission of the following photographs of *John "Jay" Tyler:* Exhibit No. 3124 and 3127 displayed lungs; Exhibit No. 3148 showed a heart; Exhibit No. 3148 depicted ribs and a breast bone; Exhibit No. 3154 displayed a liver; Exhibit No. 3146 viewed a chest cavity after the chest organs had been removed; and Exhibit No. 3151 depicted a lower jaw.

■■■ Defendant argues that "none of these photos depict the victims' bodies in their natural state after [their] deaths," but instead "show [the victims'] appearance after the pathologist has done his work." Appellant's Br. at 70. He correctly points out that photographs showing the victim's body in an "altered condition," *e.g.,* during or after an autopsy has been performed, are generally *inadmissible* because they may impute the work of the pathologist to the defendant. *See Turben v. State,* 726 N.E.2d 1245, 1247 (Ind.2000); *Fentress v. State,* 702 N.E.2d 721, 722 (Ind.1998); *Allen v. State,* 686 N.E.2d 760, 776 (Ind.1997), *cert. denied,* 525 U.S. 1073, 119 S.Ct. 807, 142 L.Ed.2d 667 (1999); *Loy v. State,* 436 N.E.2d 1125, 1128 (Ind.1982); *Warrenburg v. State,* 260 Ind. 572, 574–76, 298 N.E.2d 434, 435–6 (1973); *cf., Kiefer v. State,* 239 Ind. 103, 116–18, 153 N.E.2d 899, 904–05 (1958).

■■■ We do consider these close-up photographs viewing multiple gunshot and

stab wounds to the victims' internal organs to be gruesome if not ghastly. But "'[e]ven gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally.'" *Mitchell*, 726 N.E.2d at 1237 (quoting *Amburgey v. State*, 696 N.E.2d 44, 45 (Ind.1998)).

██ The photographic evidence complemented the pathologist's testimony as well as other evidence introduced at trial and was relevant in rebutting Defendant's contention that he neither shot the victims multiple times with his SKS assault rifle nor stabbed the victims with a knife. First, the photograph evidence was illustrative of the pathologist's testimony concerning the cause of the victims' death. For instance, the pathologist testified that the "high powered rifle" bullets used to commit the multiple killings penetrated the rear of the truck, struck the victims, and traveled through their bodies. The pathologist also testified that all three victims were shot and then subsequently stabbed by their assailant. This determination corroborated Funk's account of the timing of the circumstances surrounding the murders. Although Defendant did not contest the cause of death, the photographs helped to illustrate the pathologist's testimony describing the chest wound from a knife causing Brandy Southard's death and the projection and path of the fatal bullets from a high powered rifle causing the deaths of Kathy Tyler and John Tyler. Second, other evidence introduced at trial suggested that Defendant owned a knife similar to the one used to inflict multiple stab wounds on the victims. Further, forensic testing proved that the bullets found in the victims' bodies came from the same SKS assault rifle owned by Defendant. And Defendant was seen shooting his rifle shortly before the murders occurred. The post-autopsy photographs complemented this evidence as well as Funk's testimony.

██ As previously stated, we agree with Defendant that the post-autopsy photographs were gruesome. Thus, we presume that they had a prejudicial effect when shown to the jury. However, the prejudicial effect was not so substantial as to outweigh their probative value. Accordingly, we find that the trial court did not abuse its discretion in finding that the probative value of the photographs outweighed any prejudicial effect on the jury.[27] *See, e.g., Wright*, 730 N.E.2d at 720 (holding no abuse of trial court discretion in allowing photographs at issue establish the cause of death and the manner in which the crime was committed and the evidence was particularly probative inasmuch as the defendant attempted to establish that he was not the perpetrator); *Fentress*, 702 N.E.2d at 722 (holding no abuse of discretion where trial court allowed the admission of autopsy photographs depicting the victim's shattered skull with the hair and skin pulled back because the photos showed the force of the blow, which in turn, bore on the intent to kill); *Elliott v. State*, 630 N.E.2d 202, 204 (Ind.1994) (holding no abuse of discretion where trial court allowed the admission of autopsy photos of a victim's heart which was probative to overcome the defendant's claim of accidental killing); *Jackson*, 597 N.E.2d at 963 (ruling that the trial court properly admitted photographs taken during the autopsy showing view of victim's skull and brain because they were probative to illustrate trauma caused by the blows to her

**27.** Having found that, collectively, these post-autopsy photographs were properly admitted during the guilt-determination phase, we decline Defendant's invitation to address whether such evidence subsequently unduly prejudiced the jury during the penalty phase. *See* Appellant's Br. at 68 (arguing that post-autopsy photographs which "depict removed organs and body parts should be reviewed under the principles of proportionality outlined" in *Bivins v. State*, 642 N.E.2d 928 (Ind.1994), because "evidence from the guilt phase is incorporated into and considered by the jury in the penalty phase") (citing Ind.Code § 35–50–2–9(d)).

head and they also served to aide the pathologist's testimony).

## X

Defendant next contends that the evidence presented at trial was insufficient to support his convictions because Mossberger and Funk's testimony on the events surrounding the murders was "incredibly dubious." Defendant also claims that the State's case lacked motive and that there was no circumstantial evidence connecting him to the murders. *See* Appellant's Br. at 9, 29, 31. He further directs our attention to alibi witnesses who placed him at their home around the time the murders occurred, *see id.* at 9, 29, and to other witnesses who suggested that another person had allegedly confessed involvement in the murders, *see id.* at 29–30. All of this, Defendant's argument continues, demonstrates that the State failed to establish the "substantial evidence" of probative value required to support a conclusion of guilt beyond a reasonable doubt. *See id.* at 31.

When reviewing a sufficiency of the evidence claim, we neither reweigh the evidence nor assess the credibility of witnesses. *See Williams v. State,* 669 N.E.2d 1372, 1387 (Ind.1996), *cert. denied,* 520 U.S. 1232, 117 S.Ct. 1828, 137 L.Ed.2d 1034 (1997). We only consider the evidence most favorable to the jury's verdict, along with all reasonable inferences to be drawn therefrom, and will affirm a conviction if the probative evidence and reasonable inferences drawn from the evidence could have led the jury to find a defendant guilty beyond a reasonable doubt. *See id.*; *Davis v. State,* 598 N.E.2d 1041, 1045 (Ind. 1992), *cert. denied,* 510 U.S. 948, 114 S.Ct. 392, 126 L.Ed.2d 340 (1993).

Defendant first attacks the credibility of Funk and Mossberger by arguing that both witnesses had "motives to lie" in order to implicate Defendant as the perpetrator who killed the three victims and to exonerate themselves. *See* Appellant's Br. at 10. We considered a similar credibility issue questioning testimony of a witness who was with the defendant when the crime occurred in the capital case of *Timberlake v. State,* 690 N.E.2d 243 (Ind.1997), *cert. denied,* 525 U.S. 1073, 119 S.Ct. 808, 142 L.Ed.2d 668 (1999). There we determined that even though the State did not charge the witness to the crime as an accomplice, the "potentially self-serving testimony [was] similar to that of one accomplice testifying against another," because "[b]oth situations contain the same credibility concerns." *Id.* at 252. Here, the most incriminating evidence against Defendant came primarily from the testimony of Funk and Mossberger. Like the witness in *Timberlake,* neither Funk nor Mossberger was charged as an accomplice. Funk admitted he was present throughout the crime spree of burglarizing Napier's mobile home and during the commission of the murders. And Defendant lists other examples claiming that Funk had a motive to fabricate: Funk's shoeprint was found underneath the broken window of Napier's mobile home; Funk admitted that he did not want to go to jail; Funk was jealous of Defendant's friendship with one Kathy Morreira, whom Funk had been dating; Funk told his roommate, Kenny Jennings, that he would "cut out [Defendant's] liver" (R. at 29,386, 29,431); and Funk told Morreira that he implicated Defendant for "all the wrong reasons" (R. at 30,101–02). *See* Appellant's Br. at 11. Defendant also puts at issue Mossberger's credibility and his motivation to lie. In particular, he emphasizes that Mossberger had possession of the murder weapon after the murders occurred and that Mossberger hid the weapon along with the ammunition in the woods.

Having said that, the testimony of an accomplice is subject to high scrutiny. We have also concluded that such testimony is alone sufficient to sustain a conviction. *See Timberlake,* 690 N.E.2d at 252; *see also Thompson v. State,* 671 N.E.2d 1165, 1167 (Ind.1996), *reh'g denied; Garrison v. State,* 589 N.E.2d 1156, 1159 (Ind.

1992); *Douglas v. State*, 520 N.E.2d 427, 428 (Ind.1988). We have further stated, "The fact that the accomplice may not be completely trustworthy goes to the weight and credibility of the witness' testimony, something that is completely within the province of the [jury] and cannot be reviewed on appeal." *Timberlake*, 690 N.E.2d at 252.

In this case, the jury was made aware of Funk's and Mossberger's involvement before and after the murders occurred and heard witness testimony which, Defendant urges, indicated that Funk had other possible motives to fabricate. But it was still the jury's prerogative as to how much weight and credibility to give to Funk's and Mossberger's testimony. *See Griffin v. State*, 493 N.E.2d 439, 443 (Ind.1986) ("When a jury is aware of a witness' possible motives or bias, [the jury] can use the information to assess the witness' credibility.") (citing *Shields v. State*, 490 N.E.2d 292 (Ind.1986), *reh'g denied.*). Furthermore, contrary to Defendant's contention,[28] the record indicates that there was circumstantial evidence connecting Defendant to the shooting. Defendant had possession of the murder weapon before the murders occurred. Forensic testing established that the fatal bullets matched those fired from the SKS assault rifle owned by Defendant. And the spent shell casings retrieved from the crime scene and the recovered ammunition were similar to those discovered in Southard's and Napier's mobile home where Defendant had earlier confiscated ammunition on the day of the murders.

▆▆▆ Defendant further challenges the testimony of Funk and Mossberger by focusing on several inconsistencies between their testimony, and by highlighting inconsistencies between their previous individual statements to police and trial testimony. He specifically argues that such inconsistencies make the testimony "incredible." However, inconsistencies in the testimony of two or more witnesses go to the weight of the evidence and credibility of each individual witnesses' testimony, *see Dobbins*, 721 N.E.2d at 875; *Timberlake*, 690 N.E.2d at 252, and such inconsistencies do not make the evidence "incredible" as a matter of law, *see Kappos v. State*, 465 N.E.2d 1092, 1096 (Ind.1984). Here, the jury was fully apprised of these inconsistencies and had the opportunity to make credibility determinations. "[J]udging the credibility of witnesses lies squarely within the province of the jury and we will not reassess its credibility determinations." *Ellis v. State*, 707 N.E.2d 797, 801 (Ind. 1999) (citing *Gee v. State*, 526 N.E.2d 1152, 1153 (Ind.1988)). We find no basis to reassess the jury's credibility determinations here.

▆▆▆ Defendant argues that the "incredible dubiosity" rule should apply in his case because his convictions were based on Funk's and Mossberger's testimony which was "highly improbable," as well as "equivocal, vacillating, and contradictory." Appellant's Br. at 14, 20, 22. " 'Under this rule, a court will impinge on the jury's responsibility to judge the credibility of the witness only when it has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity.' " *White v. State*, 706 N.E.2d 1078, 1079 (Ind.1999) (quoting *Tillman v. State*, 642 N.E.2d 221, 223 (Ind.1994) (internal quotation omitted)). "When a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be

---

**28.** Defendant contends that there was "absence of circumstantial evidence" and no physical evidence connecting him to the murders because no blood, hair, or fiber, was found in his car or on his clothes, *see* Appellant's Br. at 27 (citing R. at 27,298, 28,865, 28,935), and his fingerprints were absent from the Tyler truck, the murder weapon, and the ammunition case, *see id.* (citing R. at 24,298, 21,498, 28,865, 28,775, 28,935). Defendant also points out that neither shoe prints nor tire tracks placed him at the crime scene. *See id.* (citing R. at 28,935.)

reversed." *Id.* We have recognized that application of this rule is rare and that the standard to be applied is whether " 'the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.' " *Bradford v. State,* 675 N.E.2d 296, 300 (Ind.1996) (quoting *Pardue v. State,* 502 N.E.2d 897, 898 (Ind.1987), *reh'g denied.*), *reh'g denied.*

■ There is no dispute that Funk was the State's sole eyewitness to the burglary at Napier's mobile home and to the commission of the murders. Although there were discrepancies among Funk's statements made to police, his statements made in depositions, and his trial testimony, witness testimony that contradicts witness's earlier statements does not make such testimony "incredibly dubious." *See Davenport v. State,* 689 N.E.2d 1226, 1230 (Ind. 1997), *reh'g granted in part,* 696 N.E.2d 870 (1998). Funk unequivocally identified Defendant as the perpetrator who shot the three victims and he did not waver in his identification of Defendant's assault rifle used to commit the killings. This part of his testimony was supported by circumstantial evidence. Furthermore, Funk's testimony regarding the circumstances before and after the murders was corroborative of Mossberger's testimony as well as other witness testimony.

Defendant also contends that Funk's testimony was a product of Officer Heilman's suggestions given when the Officer first questioned Funk about the crimes. *See* Appellant's Br. at 24–6 (citing R. at 24,410–11, 24,453–55.) Defendant complains, "Funk's admissions of susceptibility to suggestion and guessing reveal a lack of authenticity for his story." *Id.* at 11. However, there is no evidence in the record to suggest that Funk's testimony was coerced. During defense counsel's cross-examination of Funk, the jury heard the nature of Officer Heilman's initial questioning of Funk. We find that a reasonable person could have believed Funk's testimony, and reiterate that " '[i]t is the province of the jury to hear the testimony given by the witnesses and to assess the truth and veracity of each witness.' " *White,* 706 N.E.2d at 1080 (quoting *Wear v. State,* 593 N.E.2d 1179, 1179 (Ind.1992)); *Davis v. State,* 658 N.E.2d 896, 898 (Ind.1995), *cert. denied,* 516 U.S. 1178, 116 S.Ct. 1275, 134 L.Ed.2d 221 (1996).

Finally, to further support his contention that the State failed to establish the requisite "substantial evidence" to support a conclusion of guilt, Defendant focuses on the testimony of alibi witnesses and witness testimony suggesting that other persons admitted involvement in the murders. *See* Appellant's Br. at 28–31.

■ "The State is not required to rebut directly a defendant's alibi. It may disprove the alibi by proving its own case in chief beyond a reasonable doubt." *Lott v. State,* 690 N.E.2d 204, 209 (Ind.1997). Here, Defendant directs us to his presentation of alibi witnesses who testified that they saw Defendant just after 10:00 p.m. on the night of the murders. One of these witnesses claimed that she had spoken to Defendant.[29] Such testimony directly conflicted with Funk's and Mossberger's testimony that Funk and Defendant left Mossberger's house during the 10 o'clock news. The alibi testimony also contradicted the testimony of Funk's roommate, Kenny Jennings. Jennings testified that on the night in question, Defendant and Funk arrived at Funk's apartment during the sitcom "Cheers" which aired between 10:00

---

29. The alibi witnesses included Julie Girtman and Caroline Pevelak, and their mother, Emily Girtman. Julie and Emily offered testimony indicating that on the night of the murders, they were watching the 10:00 evening news on television when Defendant pulled into their driveway. Julie testified that she went outside to speak to Defendant for about 25 minutes. During this time, her sister, Cindy Pevelak, drove up and noticed Defendant and her sister Julie engaged in conversation. Julie and Emily testified that when Julie returned from talking to Defendant, the 10:00 p.m. program had ended and the sitcom show "Cheers" came on.

and 10:30 p.m. Additionally, the alibi testimony contradicted Defendant's initial alibi given to police officers. Our review of the record indicates that on March 30, 1996, just two days after the murders occurred, Defendant voluntarily gave a taped statement to police officers which was later played for the jury. In this statement, Defendant admitted that he saw and briefly talked to Jay, Kathy, and Brandy at a local Circle S store between 9:30 and 10:00 p.m. on the night the murders occurred. Defendant also stated that after seeing the victims, he went to Mossberger's house and drank wine, and then went straight home. Thus, the jury was made aware of such inconsistencies between Defendant's own stories regarding his whereabouts on the night in question. We find that it was within the jury's purview to believe the testimony of Mossberger and Funk over the testimony of alibi witnesses tending to exculpate Defendant. *See Carr v. State,* 728 N.E.2d 125 (Ind.2000) ("A jury may choose to disbelieve alibi witnesses if the State's evidence renders such disbelief reasonable.") (citing *Lambert v. State,* 516 N.E.2d 16, 19 (Ind.1987), *reh'g denied.*). We will not disturb the jury's prerogative to weigh the credibility of witnesses and to weigh the evidence.

Defendant also points to other witnesses' testimony implicating one Guy James Knight, rather than Defendant, as the person who committed the murders. *See* Appellant's Br. at 28, 29. One defense witness testified that Brandy Southard told her that Napier owed Knight money, and that if Knight was not paid, he was "going to put a bullet in [Southard's] ass." (R. at 29,536.) Another defense witness, Allen Fletcher, testified that he shared a jail cell with Knight in Vanderburgh County, and stated, "[Knight] told me that he was the one, after the firing was over, that cut their throats and stabbed them." (R. at 29,704.) Police questioned Knight who said he worked for a local landlord and drug dealer named Herschel Seifert. Knight told police that he was at home with his girlfriend at the time the murders

had occurred and denied ever threatening Southard. Knight's girlfriend, however, confirmed one threat made against Southard.

Defendant presented additional evidence along these lines establishing the possibility that the killings occurred as a result of a drug hit ordered by Seifert. However, a jury is entitled to disbelieve the defendant's evidence and to believe the State's evidence. *See Bradford,* 675 N.E.2d at 299 (determining that where conflicting evidence was presented, the jury was not required to believe the defendant's evidence, and that the jury had every right to believe the State's evidence instead); *see also Harris v. State,* 617 N.E.2d 912, 915 (Ind.1993) (recognizing that a jury was entitled to believe or disbelieve evidence presented by State and the defendant in a criminal trial), *overruled on other grounds by Wright v. State,* 690 N.E.2d 1098 (Ind.1997). The evidence concerning Knight was presented to the jury. It was well within the jury's ability as well as its province to assess the witnesses' relative credibility and to believe the State's evidence over Defendant's evidence suggesting that Knight confessed to the murders. Again, we find no reason to reassess the jury's credibility determinations.

After considering all the evidence most favorable to the verdict as well as drawing all reasonable inferences therefrom, we conclude that the jury could have reasonably concluded beyond a reasonable doubt that Defendant committed the burglary and the three murders. We also find no basis to impinge on the jury's credibility determinations and therefore decline to apply the incredible dubiosity rule.

## XI

We now review whether Defendant's death sentences are appropriate. The Indiana Constitution provides that "[t]he Supreme Court shall have, in all appeals of criminal cases, the power to review and

revise the sentence imposed." Ind. Const. art. VII, § 4. Although our rules for appellate review of sentences require that deference be given to the judgment of the trial court where the sentence is death, those rules "stand more as guideposts for our appellate review than as immovable pillars supporting a sentence decision." *Spranger v. State*, 498 N.E.2d 931, 947 n. 2 (Ind.1986), *cert. denied*, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 536 (1987). Moreover, "this Court's review of capital cases under article 7 is part and parcel of the sentencing process." *Cooper v. State*, 540 N.E.2d 1216, 1218 (Ind.1989).

This special review of death sentences is grounded in the Indiana Constitution, our state's death penalty statute, and federal death penalty jurisprudence. *Harrison v. State*, 644 N.E.2d 1243, 1260 (Ind.1995), *cert. denied*, 519 U.S. 933, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996). The United States Supreme Court "has repeatedly said that under the Eighth Amendment 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.'" *Caldwell v. Mississippi*, 472 U.S. 320, 329, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (quoting *California v. Ramos*, 463 U.S. 992, 998–99, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983)). Meaningful appellate review of death sentences plays a crucial role in ensuring that the death penalty is not imposed arbitrarily or irrationally. *Parker v. Dugger*, 498 U.S. 308, 321, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991).

Defendant challenges the appropriateness of his death sentences, contending that the one aggravator did not outweigh the mitigating circumstance of the "residual doubt" of his guilt. *See Dye v. State*, 717 N.E.2d 5, 21 (Ind.1999) (citing generally *Miller v. State*, 702 N.E.2d 1053, 1069 (Ind.1998) (describing residual doubt as

"[w]hen a jury finds a defendant guilty beyond a reasonable doubt, there still may be a measure or residuum of doubt about the defendant's guilt"), *cert. denied*, 528 U.S. 1083, 120 S.Ct. 806, 145 L.Ed.2d 679 (2000)), *cert. denied*, —— U.S. ——, 121 S.Ct. 379, 148 L.Ed.2d 292 (2000). Defendant specifically argues that residual doubt exists in his case because two key State witnesses, Funk and Mossberger, had "compelling reasons to lie;" the State's lack of physical evidence connecting him to the murders; and the fact that his "defense was supported by four alibi witnesses." Appellant's Br. at 78–79. Based upon the residual doubt, he asks this Court to set aside his death sentences and to enter sentences of life without parole.

Our death penalty statute guides our review of death sentences by providing standards for governing the trial court's imposition of death sentences. Following the completion of the guilt-determination phase of the trial and the rendering of the jury's verdict, the trial court reconvenes for the penalty phase. Before a death sentence can be imposed, our death penalty statute requires the State to prove beyond a reasonable doubt at least one aggravating circumstance listed in subsections (b)(1) through (b)(16) of the statute.[30] *See* Ind.Code § 35–50–2–9 (1998). In this case, the State supported its request for the death penalty with the following aggravating circumstances: (1) that Defendant intentionally discharged a firearm from a vehicle, *see* Ind.Code § 35–50–2–9(b)(14)(B) (Supp.1995); (2) that Defendant committed at least one of the murders by lying in wait, *see id.* § 35–50–2–9(b)(3); and (3) that Defendant "has committed another murder, at any time, regardless of whether the defendant has been convicted of that other murder," *see id.* § 35–50–2–9(b)(8). To prove the

---

**30.** We note that at the time the murders occurred, the effective statutory aggravators upon which Defendant could have been sentenced to death or life imprisonment without parole were listed in subsections (b)(1)

through (b)(14). *See* Ind.Code § 35–50–2–9 (Supp.1995). The legislature has since then promulgated two more statutory aggravators under subsection (b). *See* P.L. 228–1996, § 1; P.L. 261–1997 § 7.

existence of these aggravating circumstances, the State presented no additional witnesses at this stage, but rather relied upon evidence from the guilt-determination phase of the trial.

The death penalty statute requires that any mitigating circumstances be weighed against any properly proven aggravating circumstances. In addition to Defendant's mitigating circumstances presented during the guilt-determination phase (the Defendant's four alibi witnesses testifying that they saw Defendant around the time the murders had occurred and Defendant's witnesses testifying that they overheard Knight admit to involvement in the murders), Defendant offered the testimony of one witness at the penalty phase, Pam Patterson, a public information officer at the Indiana Department of Correction. She testified that the vast majority of multiple murder offenders held in Indiana jails have not been sentenced to death, but instead were serving either a term of years or life imprisonment without parole.[31] The jury found that the State did not meet its burden in proving beyond a reasonable doubt that Defendant committed the first two alleged aggravators; however, the jury did find that the State proved beyond a reasonable doubt that Defendant murdered Jay Tyler, Kathy Tyler, and Brandy Southard. The jury further determined that this one aggravator outweighed any mitigating factors and recommended that the death sentence be imposed.

Once the jury has made its recommendation, the jury is dismissed, and the trial court has the duty of making the final sentencing determination at the sentencing hearing. First, the trial court must find that the State has proven beyond a reasonable doubt that at least one of the aggrava-

ting circumstances listed in the death penalty statute exists. *See* Ind.Code § 35–50–2–9(k)(1) (1998). Second, the trial court must find that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances. *See id.* § 35–50–2–9(k)(2). Third, before making the final determination of the sentence, the trial court must consider the jury's recommendation. *See id.* § 35–50–2–9(e). The trial court must make a record of its reasons for selecting the sentence that it imposes. *See id.* § 35–38–1–3.

In imposing the death sentences in the instant case, the trial court found that the State proved beyond a reasonable doubt one of the aggravating circumstances listed in the death penalty statute—that Defendant committed multiple murders. (R. at 32,436–48.) The record and the law support this finding.

At the sentencing hearing, Defendant presented one additional witness, Sister Helen Prejean, who testified to her personal account of past experiences in consoling death row inmates and also provided testimony relating to her religious beliefs which underpinned her view against capital punishment. After hearing Sister Helen's testimony and considering Defendant's final argument to the trial court, the trial court issued its sentencing order. In the sentencing order, the trial court primarily reflected upon Funk's account of the events leading up to the murder, including the Napier mobile home burglary and Defendant's car chase of the victim's truck throughout Warrick County's rural roads. The court also recounted the substance of Funk's testimony on the commission of the murders: that when the Tyler truck had

---

**31.** *The public information officer offered the following testimony:*

[Defense Counsel]

 Q: How many men on death row in the State of Indiana are on death row for committing multiple murder?

[Public information officer]

 A: Twenty-three (23)

 Q: ... [H]ow many men are in our state prisons, not on death row, who have committed multiple murder?

 A: As of 5/14/97, there were one hundred eighty-five (185).

(R. at 31,859.)

stopped, Defendant grabbed his SKS assault rifle and began to fire as soon as Jay Tyler opened his door; that when the shooting stopped, Defendant got back in his car, drove some fifty to seventy-five feet, stopped the car, and got out; that a few minutes later, Defendant returned to the car and told Funk, "You breathe a word of this and I'll kill you." The trial court then acknowledged that Defendant "effectively" attacked Funk's veracity "on many points." (R. at 32,-441.) The trial court also considered the testimony of alibi witnesses as well as the testimony of other witnesses indicating that another person admitted involvement in the crimes. However, based upon Funk's testimony and other evidence introduced during the guilt-determination phase, the trial court concluded that the State proved beyond a reasonable doubt that Defendant committed three separate murders in a single incident. *See* Ind.Code § 35–50–2–9(b)(8).

The trial court found three non-statutory mitigating factors [32] which were listed in the presentence report: (i) in 1995, the Indiana legislature offered a sentence of Life Without Parole as an equal alternative to the death penalty; (ii) the majority of offenders held in Indiana prisons who have committed multiple murders were not sentenced to death; and (iii) Defendant demonstrated that he could safely be imprisoned if a sentence of Life Without Parole were imposed. (R. at 32,444–45; *see also* Defendant's Presentence Report at 5–6.) The court assigned "low weight" to these three mitigation factors. (R. at 32,444.) The trial court also showed "great respect" for Sister Helen Prejean's position against the death penalty, and even acknowledged that the "vast majority of religious organizations in the United States favor the abolition of the death penalty," (R. at 32,444), but declined to consider the "very significant moral issue

as a mitigation circumstance in the sentencing process," (*id*).

In accordance with our death penalty statute, the trial court found that the non-statutory mitigating circumstances were outweighed by the multiple murder aggravator for all three counts of murder. The trial court also gave consideration to the jury's recommendation, the presentence report, and Defendant's independent report. We find that the trial court's sentencing order complies with the requirements imposed by the death penalty statute and case law.

■ Based on our review of the record and the law, we agree with the trial court's conclusion that the State proved beyond a reasonable doubt the (b)(8) aggravating circumstance promulgated in the death penalty statute. As discussed in Part IX, *supra*, during the guilt-determination phase of the trial, Defendant repeatedly attacked the veracity of Funk's and Mossberger's testimony, presented testimony that someone else could have committed the murders, and offered the testimony of four alibi witnesses. Yet both the jury and the trial court found the testimony of Funk and Mossberger to be more credible than the Defendant's witnesses and other exculpatory evidence. The witness testimony offered by Defendant and the inconsistencies in Funk's testimony persuaded neither the trial court nor the jury of Defendant's innocence. We are also not persuaded. We agree with the trial court that the aggravating circumstance outweighs the non-statutory mitigating circumstances. We find that residual doubt does not provide a basis for revising Defendant's sentences to life without parole, and therefore conclude that the death penalty is appropriate for Defendant's murder of John "Jay" Tyler, Kathy Tyler, and Brandy Southard.

**32.** According to Indiana Code § 35–50–2–9(c)(8) (1998), a trial court may find mitigat-

ing "[a]ny other circumstances appropriate for consideration."

## Conclusion

We affirm Defendant's convictions and the imposition of the death sentences.

SHEPARD, C.J., and DICKSON, BOEHM, and RUCKER, JJ., concur.