Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT:

**KATHLEEN M. SWEENEY**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHERINE MODESITT COOPER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

CHRISTOPHER WHITE,     )
     )
    Appellant-Defendant,    )
     )
     vs.    )    No. 49A04-1203-PC-102
     )
STATE OF INDIANA,    )
     )
    Appellee-Plaintiff.    )

APPEAL FROM THE COURT
The Honorable Robert R. Altice, Judge
Cause No. 49G02-0806-PC-147054
Cause No. 49G02-0806-FC-147054

**December 26, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Christopher White utilized the *Davis/Hatton*[1] procedure to bring this consolidated direct and post-conviction appeal challenging his conviction for Fraud on a Financial Institution[2] as a class C felony and the denial of his petition for post-conviction relief in which he claimed that he received ineffective assistance of trial counsel. White raises the following issues in this appeal:

1. Was there sufficient evidence to support White's conviction for fraud on a financial institution?

2. Did White receive the effective assistance of trial counsel?

We affirm.

In January 2008, White was a real estate developer who operated a number of business entities, including Premier Properties USA, Inc. (Premier), of which he was general partner and president. Premier was a privately held property management and development company with approximately 100 employees. Christi Minars was Premier's business comptroller and in that capacity managed the books and records for Premier's various corporate entities. Part of Minars's duties involved providing White with a daily spread sheet detailing bank account balances. Minars frequently was in contact with White throughout the business day by telephone and by email. Although White's business interests were numerous, he required that all checks issued by his business be approved by him personally.

---

[1] A *Davis/Hatton* request terminates or suspends a previously initiated direct appeal upon a request for remand or stay, in order to allow the defendant to pursue a petition for post-conviction relief in the trial court. *Hatton v. State*, 626 N.E.2d 442 (Ind. 1993); *Davis v. State*, 267 Ind. 152, 368 N.E.2d 1149 (1977). Issues initially raised in the appeal as well as those determined in the post-conviction relief proceeding may be raised in the appeal.

[2] Ind. Code Ann. §35-43-5-8 (West, Westlaw current through 2012 2nd Reg. Sess.).

White had both personal and business accounts with National Bank of Indianapolis (NBI), a federally insured, federally chartered bank based in Indianapolis. White, who had maintained accounts with NBI for twelve years, was considered to be a valued customer of NBI. Of the approximately ten personal and business accounts White maintained with NBI, one was Reffco II, LP, and another was Premier's payroll account (PPUSA). Tricia Rake and Loaren Muehl, NBI employees, handled White's personal and business accounts. Rake was vice-president of private banking and specialized in marketing and bringing in new clients, particularly those described as high-end clients. Muehl, who was Rake's assistant, handled day-to-day customer relations. Rake's supervisor was Joyce Morris, a bank vice-president and manager of private banking. Rank and Muehl were White's primary contacts at NBI and the contact with White or his employees was daily.

Late in 2007, White opened an account at J.P. Morgan Chase Bank (Chase Bank), and the account was held in the name of HPT, LLC and had a balance of $1,000. White opened the account for the purpose of acquiring property in Las Vegas. White was the sole owner and signator of HTP, LLC.

White used an outside company, ADP, to process payroll checks for his businesses. On a biweekly basis, the human resources department contacted Minars about the amount of money needed to cover payroll, and Minars would inform White of the amount. White would then authorize a transfer into the payroll account. ADP then processed the transaction with NBI through a wire transfer from the PPUSA account to cover payroll.

At approximately 9:30 a.m. on January 30, 2008, Muehl sent Minars an email in which she stated that the Reffco account was overdrawn in the amount of $60,961.70. Muehl requested coverage for the overdraft by 10:00 a.m. that day, or the bank would have to return the check that had caused the overdraft. At 9:34 a.m., Minars sent Muehl an email directing her to transfer $65,000 from one of Premier's other accounts into the Reffco account. A wire transfer was used because it allowed for an immediate transfer of funds, instead of by check, which takes a couple of days to clear.

At approximately 11:30 a.m., Muehl sent a second email to Minar, Rake, and White with the subject line reading "PPUSA." Muehl indicated in that email that the amount needed for payroll according to ADP was $237,476.23, and that the money needed to be in the PPUSA account by 3:30 p.m. in order to send the wire out. The email also indicated that the PPUSA account was overdrawn by $182,602.20.

At 11:51 a.m., Minars forwarded to White a cash summary, which included the bank account balances and the company's total cash position. She informed White that the bank account balances were insufficient to satisfy the payroll, and told White that the payroll cash need was $425,000.00 by 3:30 p.m. The cash summary for White's businesses showed a total bank balance on his accounts of $132,323.09.

White sent an e-mail response to Minars at 1:18 p.m. with a subject line of "FW: PPUSA" stating "Lets [sic] write a check on Chase. Let me know how much." *Transcript* at 86. Minars was concerned and replied at 1:19 p.m. via e-mail "$425,000—what is going on????" *Id* at 87. White replied, again by e-mail, at 1:19 p.m. stating, "I guess make it 500K

4

and let's do it now." *Id*. at 87. At the time of the email exchange, both White and Minars knew that the Chase Bank account had a $1,000.00 balance.

Minars, operating under White's explicit instruction, prepared a check in the amount of $500,000.00 from the HTP account held at Chase Bank for deposit in the PPUSA account at NBI. The check was made payable to Premier Properties USA, Inc. and bore White's electronic signature. The check was deposited into the Reffco account and $425,000.00 was transferred to the PPUSA account that day.

Muehl approached Morris with a request from payroll that funds be wired to meet payroll, or to "drawn down" on White's account. Morris approved the payroll release from PPUSA to ADP after learning from Muehl that a deposit was going to be made. When she authorized the release of the funds to cover payroll, Morris believed, based on her discussion with Muehl, that a wire would be coming in to make the funds current. Muehl sent out the wire transfer to ADP. Several wire transfers went out from PPUSA to ADP in the amounts of $237,476.23, $535.35, $54,346.14, and $128,015.92.

On February 1, 2008 at 9:36 a.m., Minars notified White by email that the check from Chase Bank had been returned. At 11:23 a.m. that same day, White sent an email to Rake, in which he informed her that "[w]e have a check for 500K that is going to be returned to you. We were provided information that a wire was sending money to that account. I am leaving on a plane at this moment to confront the party that provided us with the information. It will take me three hours to get in front of them." *Transcript* at 98. The email concluded by stating that there were "some deposits/rents coming in today" and "will report back when I

have met with the party and found out the reason for the misinformation." *State's Exhibit* 4. Rake replied to White's email asking for direction as to which account the check should be deposited in when it arrived and commenting that "[i]f that is the case based on that check size it could cause questions as it relates to kiting." *Id.*

Rake copied Minars on the email, and when addressing her directly, stated "[i]t sounds like [White] is out of pocket" and asking Minars if she could answer Rake's questions. *Id.* Two hours later Minars replied to Rake's email and stated that the check was deposited the previous Tuesday or Wednesday into the Reffco account. At the time of this email exchange, Minars did not have any information about incoming wires or about White leaving on a plane that day.

On February 4, Morris met with George Keely, the head of NBI's loan administration department, and Keely's supervisor. They decided to allow Rake to try to collect the amount of the returned check from White through February 11. On the morning of February 4, Minars sent White a cash flow summary stating that about two checks would be returned if the overdrafts were not covered by his business by 10:00 a.m. and noting that "[t]he other problem is the $500,000." *State's Exhibit* 5. At 9:40 a.m., Rake sent White an email stating that the funds needed to be covered that day. White responded to Rake's email over eight hours later stating that he was working on covering the funds "tomorrow," that funding "on the big one is eminent [sic], could be tonight, could be tomorrow or the next day, etc." and that "there is a patriot act issue that is holding up the funds" which could be lifted "at any moment." *Id.*

6

Rake sent another email to White on the morning of February 5, again reminding him that he needed to cover the returned check. She also inquired if White had any additional information about his funding. White replied to Rake's email advising her of additional returned checks and stated, "I will be depositing 500K sometime today." *Id.* On February 7, Rake sent White an email in which she asked, "Did you get the $500,000?" *Id.* White replied by email stating, "Re the 500,000, I am making the decision to do that deal today." *Id.*

On February 8, Rake and White had a forty-five minute meeting, during which time White spoke to Rake about funds he anticipated receiving from a transaction in Las Vegas that had allegedly occurred in January of that year. Rake's objective in that meeting was to obtain funds to cover the bad check, but White did not provide any funds to Rake. The next day, Minars sent White an email "expressing [her] concern about what was happening and trying to get some reassurance about what was going on in general." *Transcript* at 104. White assured Minars that he had money coming in and that the situation would be managed.

On February 11, NBI closed all of White's accounts. Prior to NBI closing Premier's accounts, some additional deposits had been received in the account in which where the returned check had been deposited. After off-setting a portion of its loss, the bank suffered a loss of approximately $382,000. Keely spoke with White and asked him why he wrote a check for $500,000 when he knew there was no money in that account. White responded that he anticipated funds coming in from a Las Vegas transaction. When Keely asked White if he

7

knew there was no money in the account when he wrote the check, White responded, "Yes." *Id.* at 94.

Keely sent an email to White on February 21 and asked him whether he had heard anything further. White responded to Keely that he had spoken to a buyer that evening and expected a wire transfer of funds either that day or the next. On February 26, Keely notified White by email that he had initiated action with counsel to help recover NBI's losses. In a follow-up email on March 6, Keely asked White where he stood in terms of repayment of the returned check. White responded that his "legal teams are busy and require payment to look at things." *State's Exhibit* 11.

Early in March 2008, Keely contacted the Marion County Prosecutor's Office for a referral of the criminal action and outside legal counsel to initiate an action to collect damages against White. In its civil action, NBI obtained a judgment against Premier, Reffco, and White and seized White's personal property valued at approximately $150,000. That amount was applied to White's home equity line of credit on his residence.

In June 2008, the State charged White with one count of fraud on a financial institution, one count of check fraud, and one count of theft, each as a class C felony. At the conclusion of a two-day jury trial, White was found guilty on all charges. When sentencing White, the trial court merged[3] White's convictions for check fraud and theft with White's conviction for fraud on a financial institution. The trial court then imposed a four-year

---

[3] The trial court stated that it was merging the three convictions; however, the record reflects that the trial court did not enter judgment on the guilty verdicts returned on the theft and check fraud offenses.

8

sentence on White's conviction with one year to be served on home detention through community corrections and three years suspended to probation. White was ordered to pay restitution to NBI in the amount of $382,486.

White filed a notice of appeal from his conviction, but later moved to dismiss his direct appeal without prejudice in order to pursue post-conviction relief. In his petition for post-conviction relief, White alleged that he had received ineffective assistance of trial counsel for his failure to investigate, depose, or call Rake's assistant, Muehl, as a witness at trial, among other allegations. The allegations pertaining to Muehl are the only ones White presents with respect to his petition for post-conviction relief, which was denied by the trial court.

1.

White's direct-appeal issue challenges the sufficiency of the evidence to sustain his conviction of fraud on a financial institution as a class C felony. In the event his argument on that conviction prevails, he further argues that there would be insufficient evidence to support the merged convictions for theft and check fraud and urges their reversal as well.

Upon review of a claim of insufficiency of the evidence, we consider only the evidence most favorable to the judgment and the reasonable inferences that can be drawn therefrom. *Childers v. State*, 813 N.E.2d 432 (Ind. Ct. App. 2004). We neither reweigh the evidence nor reassess witness credibility. *Id.* We will affirm the conviction unless we conclude that no reasonable trier of fact could find the particular defendant guilty beyond a reasonable doubt. *Id.* In order to establish that White committed fraud on a financial

9

institution, the State was required to prove beyond a reasonable doubt in relevant part that White knowingly executed or attempted to execute a scheme or artifice to defraud a state or federally chartered or federally insured financial institution. Ind. Code Ann. § 35-43-5-8 (West, Westlaw current through 2012 2nd Reg. Sess.).

White appears to argue that the evidence supporting his conviction is insufficient because it does not establish the five elements of common-law fraud. We stated the following in *American Heritage Banco, Inc. v. McNaughton*, 879 N.E.2d 1110, 1117-18 (Ind. Ct. App. 2008):

> In Indiana no common-law crimes exist, and the legislature fixes the elements necessary for any statutory crime. We may not read into a statute that which is not the expressed intent of the legislature. Criminal statutes cannot be enlarged by construction, implication, or intendment beyond the fair meaning of the language used. The five elements of common law fraud are not found in the statute defining fraud on a financial institution. In fact, the statute directly contradicts one of the elements of common law fraud when it includes a false or fraudulent promise as a basis for criminal liability. Accordingly, we will not read the elements of common law fraud into the crime of fraud on a financial institution.

(internal citations and quotations omitted). Because it is not necessary to establish the five elements of common-law fraud in order to sustain a conviction for fraud on a financial institution, White's argument based upon this premise fails.

Nonetheless, we review the evidence supporting his conviction. The mens rea requirement for the commission of this offense is "knowingly". I.C. § 35-43-5-8(a) "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code Ann. §35-41-2-2(b) (West, Westlaw current through 2012 2nd Reg. Sess.). Further, the bank fraud statute requires that any fraudulent

10

activity be done knowingly at the time of execution. *Klinker v. State*, 964 N.E.2d 190 (Ind. 2012).

The evidence presented at trial established that White ordered the preparation of a check for $500,000.00 from the Chase Bank account, which both he and Minars knew had a balance of only $1,000.00 at the time of the execution of the check. The check was issued in order to obtain funding from NBI to cover White's business payroll. The total cash flow summary for that day showed a total bank balance of $132,323.09 and White needed $425,000.00 by 3:30 p.m. in order to cover payroll. White was aware that if he did not have the money in his payroll account by 3:30 p.m. that day, his employees would not be paid. Since White had insufficient funds in his accounts to authorize a transfer between accounts to make payroll, he instructed Minars to prepare the check written on the Chase bank account.

Morris, NBI's bank vice-president, authorized the release of funds based upon the representation that a deposit would be made to NBI. White waited until the funds had been released to ADP for payroll through a wire transfer prior to informing Rake at NBI that the check was not good and would be returned. Based upon this evidence, it is reasonable for a jury to have concluded that White acted in such a manner as to induce NBI to cover his payroll by ordering the preparation and deposit of a check he knew would not be honored.

After notifying Rake that the check would be dishonored, White told Rake that he anticipated a wire transfer, and told her that he would be boarding a plane that day to confront the person responsible for the misinformation. Minars, on the other hand, testified

that she had no knowledge about an incoming wire transfer or of White travelling anywhere by plane that day.

Rake made numerous attempts to contact White and wrote emails to White on February 4, 5, and 7, requesting that White deposit funds to cover the returned check. White responded to those emails with promises that funding was imminent, a story that the big deal would come through, and alleged problems involving the Patriot Act. On February 5, White promised to deposit $500,000.00 that day. White did not make that payment and Rake contacted him two days later about his failure to do so. White responded at that time that he was making a decision to "do that deal today." *Exhibit Volume* 5, *State's Exhibit* 5, p. 4. Rake met with White on February 8, during which time White stated that a deal was supposed to have occurred in January, and that funding was supposed to have been supplied, yet provided no money to the bank. A reasonable inference from this evidence is that White lied to Rake in an effort to mislead her into the belief that funds were forthcoming.

The jury was presented with evidence that as of January 30, 2008, White did not have sufficient funds in his accounts to meet payroll demands. White was aware that he would not be receiving any additional real estate loans from Dominion Capital Management, a private finance company that had previously loaned substantial sums of money to White. Dominion's owner, William Brunstad, testified at trial that except for a $75,000.00 loan on a payment to Best Buy in February, the last disbursement of a $1.8 million-dollar loan to White occurred on January 16, 2008. Brunstad further testified that Dominion had trouble financing the final disbursement to White. He had several conversations with White in January

regarding the final disbursement of funds, during which he informed White that Dominion was out of money and would not be able to make further disbursements. The jury could reasonably infer from this testimony that White knew he had no funding from Dominion at the time he ordered the preparation of the check from the Chase account.

White knew there would be no future loans from Dominion after January 16, 2008, two weeks prior to ordering the preparation of the check. White failed to act on his promises and reassurances of payment, and on February 11, 2008, NBI closed all of his accounts. The jury reasonably concluded from the evidence that White knowingly executed a scheme or artifice to defraud NBI.

White contends that his conduct leading to this conviction was no different than his conduct on past occasions involving overdrafts. This argument was presented to the jury and rejected. A jury in its fact-finding role is not required to believe the defendant's evidence and has every right to believe the State's evidence instead. *Stephenson v. State*, 742 N.E.2d 463 (Ind. 2001). "A trier of fact is free to believe whomever it chooses in fulfilling its fact-finding function." *Brown v. State*, 659 N.E.2d 652, 658 (Ind. Ct. App. 1995).

Minars testified that there were previous instances where Premier's accounts were overdrawn, but she could not recall an instance where a subsequently dishonored check had been presented from another bank for deposit at NBI. Rake testified that in the past when one of White's accounts had been overdrawn, White would transfer money or make another deposit to cover the overdraft. On this occasion, White's accounts at NBI had insufficient funds to permit a transfer. Keely also testified that the circumstances of the transaction at

13

issue were different from those involving a simple overdraft and that he had not seen a situation such as this before. The jury was entitled to choose whichever testimony it believed. Consistent with our standard of review, we will not reweigh the evidence or reassess witness credibility. *Treadway v. State*, 924 N.E.2d 621 (Ind. 2010). There was sufficient evidence before the jury from which it could conclude that White authorized the preparation of a check on his account with Chase Bank for $500,000.00, when he knew it was only funded by $1,000.00 in an attempt to induce NBI to release the funds needed to meet his company's payroll needs.

White also claims that he was prevented from repaying NBI because NBI had closed all of its accounts. The record before us reflects that Keely made numerous attempts to contact White about repayment of the returned check. It is true that the jury had evidence before it that NBI was able to off-set some of its loss by capturing additional deposits, but the loss was not off-set because White was making repayments. Keely waited until March before contacting the State to pursue criminal action, and he did so after each of his attempts to collect the money had failed. Although NBI closed White's accounts in February, White could have sent payment to NBI to cover the returned check nonetheless, but failed to do so.

White also contends that he could not have committed fraud on a financial institution because he did not cause any loss to NBI. This argument, likewise, is without merit. White claims that since the bad check was initially deposited in the Reffco account before it was transferred into the PPUSA payroll account, prior to that transfer, he owed NBI only repayment for the advance. This argument has no traction because, regardless of the identity

14

of the account to which the check was deposited, the deposit was used by White to induce NBI to fund his payroll. NBI funded the payroll in reliance on White's assurances that a deposit was going to be made. White ordered the issuance of a check that he knew had virtually no value for deposit with NBI, waited until the payroll had been paid, and then informed NBI that the check would be dishonored. This evidence is sufficient to support White's conviction for fraud on a financial institution.

We also find unpersuasive White's claim premised upon the argument that he cannot be held criminally liable as an individual because he was acting on behalf of the corporation. In particular, he argues that the State should not have been allowed to pierce the corporate veil to prosecute him in this matter. Our Supreme Court has very recently stated as follows:

> [W]hether a [criminal] prosecution is "the 'wrong tool for the job'" . . . is not our decision to make. Rather, our job is to apply the Indiana criminal statutes as drafted by the Legislature. And under those statutes, the questions in this case include whether the Defendant[], did beyond a reasonable doubt [commit the criminal offense].

*An-Hung Yao v. State*, 975 N.E.2d 1273, 1282 (Ind. 2012). In this case, we have concluded that there is sufficient evidence beyond a reasonable doubt to support White's convictions under the statutes defining the criminal offenses.

Because we have found that there is sufficient evidence to sustain White's conviction for fraud on a financial institution, we do not address White's arguments in the alternative that there is insufficient evidence to support White's convictions for check fraud and theft. An analysis regarding the reinstatement of either or both of the guilty verdicts, upon which

15

judgment was not entered, would be necessary only in the event there was insufficient evidence of the conviction for fraud on a financial institution. Such is not the case here.

2.

White also appeals from the post-conviction court's denial of his petition for post-conviction relief in which he alleged that he received ineffective assistance of trial counsel. White claims that trial counsel should have conducted an investigation into Muehl's potential testimony and should have called her as a witness at his trial. White contends that the outcome of his trial would have been different with this testimony.

A petitioner for post-conviction relief bears the burden of establishing the grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Timberlake v. State*, 753 N.E.2d 591 (Ind. 2001), *cert. denied*, 537 U.S. 839 (2002). White is appealing from a negative judgment, and he must convince us that the evidence is without conflict and leads unerringly and unmistakably to a conclusion opposite the one reached by the post-conviction court. *Id.*; *Jervis v. State*, 916 N.E.2d 969 (Ind. Ct. App. 2009), *trans. denied* (2010), *cert. denied* 131 S.Ct. 472 (2010). The reviewing court will not reverse the judgment unless the petitioner shows that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Jervis v. State*, 916 N.E.2d 969. Further, the post-conviction court in this case issued findings of fact and conclusions thereon in accordance with Indiana Post-Conviction Rule 1(6). We will reverse a post-conviction court's findings and judgment only upon a showing of clear error, which leaves us with a definite and firm conviction that a mistake has been made. *Fisher v. State*, 810 N.E.2d

674 (Ind. 2004).  Findings of fact are accepted unless clearly erroneous, but no deference is accorded to conclusions of law.  *Id.*  The post-conviction court is the sole judge of the weight of the evidence and the credibility of the witnesses. *Id.*

The following standard of review is applicable to ineffective assistance of trial counsel claims:

> To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance.  A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms.  To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Failure to satisfy either prong will cause the claim to fail.

*Walker v. State*, 843 N.E.2d 50, 57 (Ind. Ct. App. 2006) (internal citations omitted), *trans. denied*, *cert. denied*, 549 U.S. 1130 (2007).  There is a strong presumption that counsel rendered adequate assistance.  *Stevens v. State*, 770 N.E.2d 739 (Ind. 2002), *cert. denied*, 540 U.S. 830 (2003).

Where a petitioner's argument is premised on his trial counsel's failure to present witnesses, the petitioner must offer evidence identifying those witnesses and what their testimony would have been.  *Lee v. State*, 694 N.E.2d 719 (Ind. 1998).  "[A] decision regarding what witnesses to call is a matter of trial strategy which an appellate court will not second-guess."  *Johnson v. State*, 832 N.E.2d 985, 1003 (Ind. Ct. App. 2005).  The failure to call a useful witness, however, can constitute deficient performance.  *Brown v. State*, 691 N.E.2d 438 (Ind. 1998) (citing *Clark v. State*, 561 N.E.2d 759 (Ind. 1990)).  "Absent a clear

17

showing of injury and prejudice, we will not declare counsel ineffective for failure to call a witness." *Osborne v. State*, 481 N.E.2d 376, 380 (Ind. 1985). Trial strategy is not subject to attack in an ineffective assistance of counsel claim unless the strategy is so deficient or unreasonable that it falls outside the objective standard of reasonableness. *Autrey v. State*, 700 N.E.2d 1140 (Ind. 1998).

The record of the hearing on White's petition for post-conviction relief reflects that White's trial counsel made a reasonable strategic decision not to call Muehl as a witness at trial. He interviewed Muehl prior to trial and based on her statements to him about her recollection of the events decided that her testimony would damage the defense theory. In particular, he believed that Muehl's testimony would alter the timeline the defense was using. White's attorney concluded that if Muehl testified she would state that she did not wire the money for payroll until after the check was deposited and after White became upset with her. She would have testified that he pressured her to advance funds he needed to meet payroll. Morris, who did testify at trial, corroborated this information by stating that the request to advance the funds was premised upon the notion that it was "imperative" because it was connected to payroll. *Transcript* at 267. The only way Morris would have reached the conclusion was because Muehl conveyed that information to her. The only way Muehl would have had that information was because White had told her so.

Muehl's testimony at the hearing on White's petition was that she advised Morris that a deposit would be coming in later in the afternoon to cover the funds for payroll. In large part, Muehl's testimony was consistent with that of Morris. Muehl approached Morris with a

draw-down of White's account, indicated that there were insufficient funds in White's accounts to cover payroll, and that Muehl needed Morris's approval in order for the funds to be released to payroll. Further, Muehl testified at the hearing that she transferred the funds that were deposited in the Reffco account to the PPUSA account because the funds were needed to cover the wire for payroll.

White claims that Muehl's testimony was necessary at trial because it would have established his theory that NBI caused its own loss. Muehl testified at the hearing that one of White's accounts was frequently overdrawn, and the jury heard evidence at trial that NBI permitted numerous overdrafts on White's business accounts. Muehl testified that although White had overdrawn his accounts on at least ten prior occasions in 2007, he covered those overdrafts in a timely manner.

Moreover, Muehl's testimony did not contradict the evidence at trial that White knew the account at Chase Bank had a balance of $1,000.00 when he ordered the check for $500,000.00 on that account. Further, even though Muehl testified at the hearing that she transferred the money from the Reffco account to the PPUSA account because she believed that it was needed to cover payroll, the evidence at trial showed that the deposit was made to induce NBI to fund White's payroll and that NBI acted in reliance on White's assurance that a deposit would be made.

The post-conviction court's conclusion that White failed to meet his burden of establishing the ineffective assistance of trial counsel is supported by the record. White's

attorney made a reasonable strategic decision not to call Muehl as a witness after talking with her about her potential testimony.[4]

Judgment affirmed.

BROWN, J., and PYLE, J., concur.

---

[4] In his brief, White makes a passing reference to his trial attorney's failure to subpoena documents from NBI as an example of his ineffective representation of White. That allegation was probed at the hearing on White's petition, but the argument is not developed in his appellate brief beyond the passing reference. As such, the argument is waived for appellate review. *See Davis v. State*, 835 N.E.2d 1102 (Ind. Ct. App. 2005) (issue waived for review if not supported by argument or citation to authority and record); Ind. Appellate Rule 46(A)(8)(a) (appellant's arguments must be supported by cogent reasoning and citations to the authorities, statutes, and appendix that were relied on).